[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-12481
_____

D.C. Docket No. 5:10-cv-02593-TMP

JAMES HILL,
as guardian and next friend of BHJ,
a minor,

Plaintiff – Appellant,

versus

CHRISTOPHER J. CUNDIFF, et al.,

Defendants,

MADISON COUNTY SCHOOL BOARD,
RONNIE J. BLAIR,
TERESA G. TERRELL,
JEANNE DUNAWAY,
JUNE ANN SIMPSON,

Defendants – Appellees.

_____

No. 13-15444

_____

D.C. Docket No.  5:10-cv-02593-TMP

JAMES HILL,
as guardian and next friend of BHJ, a minor,

Plaintiff – Appellee,

versus

MADISON COUNTY SCHOOL BOARD, et al.,

Defendants,

JEANNE DUNAWAY,

Defendant – Appellant.

_____

Appeals from the United States District Court
for the Northern District of Alabama

_____

(August 12, 2015)

Before HULL and BLACK, Circuit Judges, and ANTOON,[*] District Judge.

BLACK, Circuit Judge:

_____

[*] Honorable John Antoon II, United States District Judge for the Middle District of Florida, sitting by designation.

2

These consolidated appeals involve student-on-student sexual harassment. Jane Doe,[1] an eighth-grade student at Sparkman Middle School, was raped[2] in a bathroom after school officials decided to use her as bait in a sting operation to catch CJC, another eighth-grade student, in the act of sexual harassment. On appeal, Doe argues the district court[3] erred in (1) granting summary judgment to the Madison County School Board (Board) on her Title IX sexual harassment claim and (2) granting summary judgment to the Board, Principal Ronnie J. Blair, Assistant Principal Teresa G. Terrell, Assistant Principal Jeanne Dunaway, and Teacher's Aide June Ann Simpson on her 42 U.S.C. § 1983 equal protection claims.[4] For the reasons explained below, we affirm the grant of summary judgment to the Board and Terrell on Doe's § 1983 equal protection claims. We reverse, however, the grant of summary judgment to the Board on Doe's Title IX

---

[1] We grant James Hill's (the father of BHJ) motion to substitute BHJ, who has now reached the age of majority while this matter has been pending, as the named plaintiff and allow BHJ to proceed anonymously as Jane Doe.

[2] We refer to this incident as a rape, rather than an alleged rape, because in reviewing a motion for summary judgment "we are required to view the facts in the light most favorable to the nonmoving party." *See Sauls v. Pierce Cty. Sch. Dist.*, 399 F.3d 1279, 1281 (11th Cir. 2005).

[3] All parties to this proceeding jointly consented to the exercise of full dispositive authority of the magistrate judge handling their case, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. We refer to the magistrate judge as the district court.

[4] Doe also appeals the district court's grant of summary judgment to Simpson for § 1983 substantive due process; to Blair for negligence/wantonness; and to Simpson for the tort of outrage. In her consolidated appeal, Dunaway argues the district court erred in denying her state-agent immunity for Doe's negligence/wantonness claim. We discuss these issues after resolving Doe's Title IX and § 1983 equal protection claims.

claim and to Blair, Dunaway, and Simpson on Doe's § 1983 equal protection claims.

## I.  FACTUAL BACKGROUND

*A.  The Parties*

At the time of the rape on January 22, 2010, Doe was a 14-year-old girl and an eighth grader.  From the time her mother became ill and later passed away in 2007, Doe grew up in foster homes scattered throughout North Carolina.  In 2008, Doe moved to Huntsville, Alabama, to live with her siblings' stepmother, Patricia Jones, before starting seventh grade.  While in Huntsville, Doe attended seventh grade and a portion of eighth grade at Sparkman Middle School, which is operated by the Board.  CJC, a 15-year old male, was also an eighth-grade student at Sparkman.

Four Sparkman officials are named as defendants in this suit: Ronnie J. Blair, Teresa G. Terrell, Jeanne Dunaway, and June Simpson.  Blair was the principal at Sparkman.  All assistant principals and teachers reported directly to Blair, and Blair retained ultimate authority for operation of the school.  Terrell and Dunaway were the assistant principals at Sparkman.  June Simpson was a teacher's aide for physical education classes.

4

*B. Board's Sexual Harassment Policies*

Prior to and during the 2009-2010 school year, the Board adhered to the following policies concerning the resolution of sexual harassment complaints and the retention of complaint-related documents and student disciplinary records.

*1. Investigation and Discipline*

Each year, school administrators assigned a team of teachers to instruct the students about Sparkman's sexual harassment policies. Both the 2009-2010 Student Code of Conduct and Board Policy Manual in effect on January 22, 2010, [5] include sections addressing student sexual harassment.

According to the Code of Conduct, the principal is ultimately responsible for handling all harassment complaints. The Code of Conduct states that students may report harassment to the "[p]rincipal, assistant principal, a teacher, or to whomever he/she feels the most comfortable." Students may fill out a student sexual harassment complaint form, though Principal Blair cannot remember seeing this form or recall a single instance in which a student used the form. The person receiving the harassment complaint "shall make the complaint known to the [p]rincipal," and the principal "shall investigate the complaint and take appropriate

---

[5] Two policy manuals are in the record. The first was approved "June 1997" and titled "STUDENT SEXUAL HARASSMENT." The second was approved "June 24, 2010" and titled "6.10 *Student Anti-Harassment Policy*." Blair testified he "believe[d]" the June 24, 2010 Policy Manual was in effect on January 22, 2010, but that is obviously a temporal impossibility. He also believed the June 1997 policy was in effect as of January 22, 2010. Viewing the facts in the light most favorable to Doe, only the June 1997 policy was effective as of January 22, 2010.

action."  Similarly, the Policy Manual provides that the school official to whom a complaint of sexual harassment is made "shall make the complaint known to the [p]rincipal of the school, except in cases where the complaint is against the [p]rincipal."  The principal "shall investigate the complaint and take appropriate action."

The record contains few details about the training used to implement the sexual harassment policies outlined in the Code of Conduct and the Policy Manual. According to Principal Blair, the Board's central office conducted all sexual harassment policy training.  Blair reportedly attended an after-school workshop about sexual harassment conducted at Sparkman, but the record does not reveal any documentation from this workshop, a list of who attended, the year it occurred, or the details of the training.  Assistant Principal Dunaway remembers attending sexual harassment training at the Madison County Administrator Academy, but that program has since been discontinued.  Again, the record contains no documentation of these training sessions.

At the time of her deposition, Assistant Principal Dunaway was not aware the Code of Conduct had any section addressing sexual misconduct or harassment. Sparkman did not revisit the sexual harassment policy with its employees every year, and no records were kept about sexual harassment training.  Principal Blair cannot remember the identity of the Title IX coordinator in 2010; does not know

how employees would discover the identity of the Title IX coordinator; and testified students were not told the identity of the Title IX coordinator. Rather than give each teacher a copy of the sexual harassment policy, a large binder containing the entire Policy Manual was kept on file at the media center and principals' office. Despite Teacher's Aide Simpson's entreaties to Blair and other faculty members, she received "no proper training" on how to handle sexual harassment complaints.

Principal Blair testified that when a student alleged another student committed sexual harassment, all school personnel were required to report the allegation up the chain-of-command to him if the complaint was "of significance." Blair was responsible for overseeing the investigation of sexual harassment complaints. The assistant principals and other staff members could also investigate complaints of sexual harassment, but they were required to report such allegations to Blair. Blair was not always the person in charge of disciplinary action with regard to sexual harassment; Dunaway and Terrell, as assistant principals, could also be in charge.

Principal Blair crafted a "catch in the act" policy[6] establishing three exclusive types of evidence sufficient for the school to discipline a student for sexual harassment. First, if students were "caught and proven" performing a sexual act, that would be grounds for disciplinary action. Second, physical

---

[6] We refer to this policy as the "catch in the act" policy because the parties have used that phrase in their briefing.

7

evidence of sexual harassment could be sufficient.  Third, discipline was warranted if a student admitted guilt.  In contrast, "one person saying" sexual harassment occurred "against another person's word does not work."  If a student complained that another student propositioned him or her for sex, that fact alone was not enough to warrant discipline "because you've got one word against another without witnesses."

Principal Blair informed other staff members, including Teacher's Aide Simpson, that students had to be "caught in the act" of sexual harassment to impose discipline.  Assistant Principal Dunaway testified that "[s]tudents in middle school, especially with the use of social media, tend to make up a lot of stories about people and if we disciplined every child for every rumor, we would have no children at our school."

*2. Recordkeeping*

Upon receiving a complaint of sexual harassment or any other disciplinary infraction, school officials conducted an investigation, which often involved interviewing witnesses.  An investigation normally produced two types of documents: (1) administrator notes and (2) witness statements.

There was no school-wide policy regarding the retention of administrator notes made during an investigation.  Administrators were authorized to arbitrarily destroy or preserve these notes.  By contrast, there was a specific policy regarding

8

witness statements.  If the sexual harassment allegation was not proven, the witness statements were quickly destroyed.  If the sexual harassment allegation was proven, school officials kept the witness statements in a student's paper file located in the principals' office.  During the summer shortly after the end of the academic year, all student conduct files (including both administrator notes, if any, and witness statements) were shredded.  The identity of the school staff member who performed the shredding is unknown.

After the shredding, the only remaining evidence of a sexual harassment infraction was an entry in the school's disciplinary computer database called iNOW.  The database contains a barebones description of each incident, without any accompanying electronic or paper files revealing the precise nature of the infraction.  Each entry contains an infraction code noting the nature of offense—such as "sexual harassment" or "inappropriate touching."  When asked how the school differentiated between inappropriate touching versus sexual harassment, Terrell testified "one is more serious than the other."  The infraction codes were meant to allow administrators to evaluate the cumulative and recidivistic nature of a student's conduct.

The infraction codes were not a systematic method of classifying misconduct, but instead an *ad hoc* determination made solely by Kathy Abernathy, the school secretary.  Assistant Principal Terrell testified that she would not tell

Abernathy which code to enter, but instead just "hand[ed] her the paperwork."

Assistant Principal Dunaway likewise "handed [Abernathy] the paperwork and she

. . . filled it out." Terrell believes Abernathy had been trained in the central office

about iNOW coding, but she does not know the nature or date of this training.

## C. *Events Prior to the Rape on January 22, 2010*

CJC, a 15 year-old eighth grader, attended Sparkman Middle School during

the 2009-2010 school year. Prior to his rape of Doe on January 22, 2010, CJC had

accumulated a disciplinary history of violence and sexual misconduct. We break

this history into four parts: (1) CJC's recorded disciplinary history in the iNOW

database prior to January 2010, the month of the rape; (2) allegations he had been

propositioning girls to have sex with him in January 2010; (3) an allegation of

"inappropriately touching" a girl on January 13, 2010; (4) and allegations he had

repeatedly propositioned Doe to have sex with him for two weeks prior to the rape.

### 1. *CJC's Recorded Disciplinary History Prior to January*

CJC's disciplinary record consists of short summaries of incidents logged in

the Board's iNOW computer system. Over 18 months preceding the rape in

January 2010, CJC had five infractions for sexual misconduct and four infractions

for violent or threatening behavior. There is no supporting documentation of these

incidents due to the shredding policies described above, and none of the

administrators remember any details about the incidents.

10

The first relevant entry on CJC's record is dated September 24, 2008, when he was a seventh grader at Ardmore High School (Ardmore). CJC received five days of in-school suspension for "[i]napp [p]ublic [d]isplay of [a]ffect," described in the notes as "[t]ouching girls in inappropriate places. Writing inappropriate notes to girls asking them to have sex with him." In another incident at Ardmore, he "[h]it another student" and received three days of in-school suspension.

After transferring to Sparkman during his seventh-grade year, CJC continued to tally disciplinary infractions for violent and sexual misconduct. On December 17, 2008, CJC received an unspecified amount of out-of-school suspension for "[f]ighting" because he "[h]it another student several times on bus." On February 4, 2009, CJC received out-of-school suspension for "[m]aking inappropriate comments to a young lady," coded as "[s]exual harassment."

In September 2009 during eighth grade, CJC received an unspecified amount of out-of-school suspension for "[h]arassment" because he "[o]ffered to pay another student to beat up a girl also stated that would he would like to kill her." On October 23, 2009, CJC was suspended from riding the bus for saying "F--- You" to the driver. On October 28, 2009, CJC received in-school suspension for "[i]nappropriate touching" coded as "[d]isobedience." On November 18, 2009, CJC was again suspended from the bus for "refusing to obey driver and keep hands off a female student," with the infraction coded as "[m]inor disruption on bus."

11

One week later, CJC received in-school suspension for "[k]issing" coded as "[d]isobedience."  On December 15, 2009, CJC received in-school suspension for "[v]erbal confrontation with another student" coded as "[d]isobedience."  Three days later, CJC received out-of-school suspension for "[t]hreatening another student" and "intimidation" while serving his in-school suspension.

Assistant Principal Terrell did not know why the school listed CJC's infraction for "[m]aking inappropriate comments to a young lady" as "sexual harassment," but listed his failure to "keep hands off a female student" as "[m]inor disruption on bus."  By Terrell's admission, there was "not a normal policy" about "what goes in the infraction box."

### 2. *Propositioning Girls to Have Sex in Bathrooms in January*

In the weeks prior to the rape in January 2010, CJC propositioned female students to have sex with him in the school bathrooms.  There are two competing versions of CJC's sexual activity in the bathrooms during January 2010.

According to Teacher's Aide Simpson, CJC "had been repeatedly propositioning other female students to have sex in the boys' bathroom."  The allegations began shortly after Thanksgiving break in 2009.  Simpson reported CJC's sexual harassment to Principal Blair in early January and suggested school officials monitor CJC at all times.  Blair responded that school officials "were going to have to catch [CJC] in the act" before taking any disciplinary action.

12

Blair's recollection differs from Simpson's. According to Blair, he learned that approximately one and a half weeks prior to the rape on January 22, 2010, there was one "alleged incident" involving CJC and female student at the school. Simpson told Blair that CJC and another student were engaged in consensual sexual activity in a bathroom in the special education wing. Blair spoke directly to CJC and the female student about the activity and took notes of the conversations. Though he normally required students to create a written statement about such incidents, Blair cannot remember whether CJC made such a statement. Blair also cannot remember the identity of the female student who made the allegations. CJC and the female student both denied engaging in any sexual activity. Blair did not impose any disciplinary action in response to the allegation because it was a "he say/she say kind of deal." Since he could not confirm the truth of the allegation, it did not count as sexual harassment and all documents relating to the investigation were shredded.

Principal Blair did not examine CJC's disciplinary records as part of his investigation. There was no reason to examine the records because he would "recall" those "big" incidents of sexual harassment that had already occurred. Nonetheless, he told Assistant Principals Terrell and Dunaway to maintain a "heightened state of alert" about CJC's activity. Blair pointed one of the school's security cameras, which had an unmonitored screen in the front office, towards the

13

school's special education bathroom.

### 3. Sexual Harassment on January 13

On January 13, 2010, there was another allegation that CJC was sexually harassing female students.   Assistant Principals Terrell and Dunaway investigated a complaint that CJC "inappropriately touch[ed]" another female student.  There are no records of this incident.

Principal Blair cannot recall the exact nature of the allegation, or even whether it involved sexual touching.  Assistant Principal Dunaway remembers some students mentioning that CJC inappropriately touched a girl's thigh during class, but she could not identify a witness with personal knowledge of the incident, nor could she remember the identity of the victim.  Assistant Principal Terrell described the incident as "middle school drama."

During the investigation, Principal Blair did not review CJC's iNOW record or any other documentation.  Assistant Principal Dunaway checked CJC's iNOW record, but it did not inform her decision about how to discipline him.  Dunaway did not review the supporting paper documentation in CJC's file regarding the October 28, 2009 "[i]nappropriate touching" infraction, the November 18, 2009 infraction for "refusing to obey driver and keep hands off a female student" infraction, or the November 25, 2009 infraction for "[k]issing."  Dunaway chose not to look at this documentation because she "had no reason to believe he was

14

guilty. I had nobody to corroborate the story."

The incident was recorded in the iNOW database. The database entry says CJC received 20 days of in-school suspension for "[d]isobedience" due to "[c]onstant[]distraction continued disruption of learning." When asked why the school listed this incidence of sexual harassment as "[d]isobedience," without any reference to inappropriate touching, Assistant Principal Dunaway explained the allegations had not been proven. Assistant Principal Terrell opined the investigation into the sexual harassment itself was "a constant disruption."

Even though "[n]othing could be proven" regarding the allegation, Principal Blair assigned CJC to 20 days of in-school suspension as a "precautionary measure," but "not as discipline for him." In-school suspension involved, *inter alia*, sweeping hallways and cleaning the lunchroom. A student assigned to in-school suspension was supervised by a custodian or plant manager. When asked whether someone was supposed to be with CJC at all times, Blair responded, "[n]ot necessarily." A student was assigned a particular task in a certain room or hallway and was not watched at all times, but instead occasionally left unmonitored. Blair would not have given CJC such latitude had he been found guilty of misconduct. CJC, however, had been assigned to in-school suspension as a precautionary measure.

15

### 4. Propositioning Doe to Have Sex

Over a two-week period prior to January 22, 2010, CJC had been badgering Doe to have sex with him in the bathroom. Doe refused to respond to him. During school on January 21, 2010, Doe told Teacher's Aide Simpson that CJC had been asking her to have sex. That same night, Doe told her guardian, Patricia Jones, that "a guy at school, [CJC], was trying to have sex with me at school." Jones told her to refuse him.

## D. January 22, 2010

### 1. Prior to the Rape

On Friday, January 22, 2010, Doe rode the bus to school, attended classes, and walked to gym class at 2:00 pm. The entrance to the gym sat directly opposite the main hallway where the principals' office was located. CJC was in the hallway performing unsupervised cleanup duties as part of his 20-day, "precautionary" in-school suspension for sexual harassment. CJC began talking to Doe next to the principals' office. CJC asked Doe to have sex with him in the sixth-grade boys' bathroom. Doe said nothing and entered the gym.

Doe lined up for roll call and then, rather than enter the locker room with other students to change into gym clothes, approached Teacher's Aide Simpson. Doe and one of her friends (whose identity does not appear in the record) spoke to Simpson near the entrance of the gym. Doe told Simpson that CJC was still

16

"messing" with her.  Simpson said "do you want to get [CJC]" in trouble and Doe

said "yes."  Simpson said, "Do you want to—you have to go meet him so that we

could set him up and get him caught because he's been doing this for a while."

Doe responded that she "didn't want to go," and walked to the locker room.  Doe

and her friend then sat in the locker room a few minutes and conversed.  A few

minutes later, Doe approached Simpson again and "told her I would do it."

Simpson asked if Doe was "sure," and Doe said yes.

Teacher's Aide Simpson escorted Doe to Assistant Principal Dunaway's

office, but the precise events that occurred in the office are disputed.  The facts

recalled by Doe and Simpson differ significantly from the events described by

Dunaway and Andrea Hallman (another teacher at Sparkman).

Doe recollects that, while in the office, Teacher's Aide Simpson "told [an

assistant principal] what was going to happen."  According to Simpson, Assistant

Principal Dunaway and another teacher, Andrea Hallman, were in the office.  Since

Dunaway was on the phone, Simpson asked for Hallman's advice about the plan to

catch CJC in the act of sexual harassment.  When Dunaway finished her telephone

conversation, Simpson spoke directly to Dunaway and described the plan to use

Doe as bait in a sting operation.  Simpson said, "I hope this is legal.  I don't know

what I'm doing."  Dunaway appeared "disinterested" and provided "no direction or

advice."  Instead, Dunaway showed Simpson some "pictures of some tile on the

17

cell phone." At this time, Doe and her friend from gym class were talking to Hallman in the doorway of the office. Because she had spoken to Dunaway and Hallman, Simpson believed "someone else was handling the situation, so I returned to the gym."

Assistant Principal Dunaway's description of the events in her office is quite different. According to Dunaway, she was speaking to Hallman about student literacy data when she saw Simpson enter the edge of her office and stand near the door. At some point, Dunaway spoke on the phone with her husband. Simpson's back faced Dunaway, and Simpson appeared to be speaking to someone outside the door while looking right and left. Simpson stood near the door for three to seven minutes, but she never spoke to Dunaway. Dunaway claims it was "common" for staff members to stand in her office without speaking to her for long stretches of time because her office is large and sits next to the school's main hallway. She disclaims any knowledge of the plan to use Doe as bait in a sting operation.

According to Hallman's affidavit, she was in Dunaway's office when Simpson arrived. Simpson stated a male student had been asking girls to meet him in the bathroom for sex. When Simpson made this comment, Dunaway was possibly conversing on the phone. Hallman stepped into the hallway and saw CJC working with a school janitor, so she returned to Dunaway's office. Simpson never told Dunaway or Hallman about the plan to use Doe in order to catch CJC in

18

the bathroom.

### 2. *The Rape*

After Doe and Teacher's Aide Simpson left Assistant Principal Dunaway's office, Simpson told Doe to inform CJC that she "would do it." Doe found CJC alone in the hallway near the principals' office. There was no janitorial supervisor around CJC at this time. Doe told CJC she would have sex, and he said to meet at the sixth-grade boys' bathroom. Doe walked slowly toward the bathroom where she stood by the water fountain. CJC asked her to go inside the bathroom, and she went in first. CJC told Doe to go inside the most spacious stall. Doe complied and moved to the back corner of the stall.

CJC directed Doe to pull down her pants, but, since she did not do it quickly enough, CJC unbuttoned her pants and then pulled his own pants down. Doe attempted to block the button of her pants, but he moved her hand away. Doe kept trying to "stall" CJC by telling him "the teachers are going to come," but CJC said they would not arrive in time. When CJC pulled his own pants down, Doe told him "I don't want to do this" and attempted to pull her pants back up. CJC, however, pulled them back down and said "I thought you wanted it." CJC anally raped Doe. Doe kept telling him to stop.

### 3. *The Aftermath*

After leaving Assistant Principal Dunaway's office, Teacher's Aide Simpson

19

returned to the gym. Shortly thereafter, Doe's friend told Simpson that Doe had left to meet CJC. Concerned for Doe's safety, Simpson returned to Dunaway's office. Simpson asked Dunaway and Hallman to search the sixth-grade bathroom. Dunaway said nothing, and Hallman said she didn't want to catch students "with their clothes off." Simpson called Kennedy, another teacher at Sparkman, and asked him to search the boys' bathrooms. She returned to the gym and asked the gym teacher to also search the boys' bathrooms. In the meantime, Hallman checked the hallway, saw a teacher checking a bathroom, and returned to her own classroom.

Within approximately one minute of receiving Simpson's phone call, Kennedy arrived in the sixth-grade boys' bathroom and saw two pairs of feet "close together" beneath the stall. He did not feel comfortable saying anything without another adult present, so he left the bathroom, saw another teacher, Campbell, and motioned for her to help him. Kennedy and Campbell entered the bathroom. Campbell asked if anyone was there and told the students to come out. CJC and Doe exited the stall. Kennedy observed CJC was noticeably erect. CJC told Kennedy he and Doe "were not doing anything but making out." Campbell spoke to Doe in the hallway and asked her what had happened, but Doe could only answer that he had "touched" her.

20

The school receptionist learned about the incident and told Assistant Principal Terrell that a boy and girl were found in a bathroom.  Terrell approached the bathroom, located Doe, and told her "you'll be suspended."  Terrell walked outside the school and spoke to Principal Blair, who was performing bus duty.  Terrell said Doe had been instructed to enter the bathroom, but "things had changed a little bit—or a lot in the situation."  Terrell walked back inside the school to escort CJC and Doe to the principals' office.

Assistant Principals Terrell and Dunaway interviewed Doe.  Terrell asked Doe why she had been in a boys' bathroom.  Terrell cannot remember Doe's response, other than "[i]t was some wording in defense of herself."  Both Terrell and Dunaway claimed Doe appeared calm during this meeting.  Teacher's Aide Simpson entered the office and made a "fist pump" gesture, saying, "I sent [Doe] and we got [CJC]."  After Simpson's entrance, Terrell and Dunaway asked Doe to leave the office and remain seated in the lobby.

Principal Blair interviewed Simpson in his office.  Teacher's Aide Simpson said she devised the sting operation with Doe in order to catch CJC in the act of sexual harassment.  According to Blair, Simpson said the plan went awry because Doe failed to meet CJC at the correct bathroom where Simpson had originally planned to catch him.

21

Principal Blair also interviewed CJC.  CJC claimed he and Doe had only kissed consensually in the bathroom.  Blair cannot recall whether he and CJC discussed any of the prior allegations of sexual harassment against CJC.

Finally, Principal Blair interviewed Doe.  She initially cried and could not tell him what happened.  After her guardian, Jones, and Teacher's Aide Simpson entered the office, Doe explained that CJC had raped her.  During this interview, Doe wrote a contemporaneous statement describing the rape in vivid detail.

Before the police arrived, the administrators conferenced to determine whether to punish CJC for the rape.  They decided to suspend CJC for five days, subject to a subsequent disciplinary hearing at the central office.  According to the "Suspension Notice" provided to CJC's guardian, the administrators imposed the suspension for "[i]nappropriate touching."

After speaking to the police, Doe was transported to a child advocacy center where nurses performed tests and provided medical treatment.  The medical records from the examination were consistent with anal rape.  Doe suffered anal lacerations, rectal bleeding, redness, and swelling, all of which are well-documented with photographs.  For reasons undisclosed by the record, the Madison County District Attorney's Office never filed charges against CJC.

22

*E. The Board's Response to the Rape*

After contacting CJC's parents about the sexual assault, Principal Blair referred CJC's disciplinary proceeding to Dr. Jim Nash, the Student Support and Personnel Director for the Board.  Nash scheduled an expulsion hearing on Wednesday, January 27, where he presided as the "Hearing Officer."  There is virtually no information in the record about this hearing.  There are no minutes, no description of the evidence before Nash, nor an explanation of Nash's reasoning.  Nash allegedly wrote a report documenting the research and conclusions of his investigation, but the Board has not produced this report.

The only evidence about the hearing is a one-page form.  The form says Nash sentenced CJC to "Alt[ernative] School Placement / duration of school year unless results of investigation suggest [unintelligible] punishment."  Later documents show CJC was assigned to alternative school "pending investigation" of the rape.

CJC attended alternative school at the "Promoting an Alternative Commitment to Excellence Alternative Education Program" (PACE) beginning on February 4, 2010.  On February 24, 2010, while at PACE, a teacher caught CJC viewing pornography on a school computer.  CJC claimed he looked at the picture "to impress a classmate."  PACE gave CJC two days of out-of-school suspension for this infraction.

23

CJC stopped attending PACE on April 2, 2010, and returned to Sparkman on April 5. The record does not explain why CJC returned to Sparkman, other than a discharge notation from PACE stating "Dr. Nash approved return due to outcome of investigation." The precise nature and findings of this investigation are unknown. The record also does not show that school officials placed any additional restrictions on CJC when he returned to Sparkman Middle School.

On May 5, 2010, Sparkman had, according to an email from Assistant Principal Terrell to Principal Blair and PACE, "additional problems with [CJC]." Among other things, CJC "kept moving to the table with his girlfriend" and "hugged a girl in front of the cafeteria." As a result, Terrell suspended him for three days and placed him in alternative school the rest of the school year from May 10 to May 26. This disciplinary infraction was never recorded in Sparkman's iNOW database.

CJC's January 22, 2010 rape of Doe is listed in CJC's iNOW record. The database entry says CJC received out-of-school suspension for "[s]exual [o]ffenses" due to "[i]nappropriate touching a female in boys bathroom." Assistant Principal Terrell contends the report describes the incident as inappropriate touching, rather than rape, because CJC admitted to "making out" with Doe, whereas no one actually witnessed the rape. Thus, the rape was not definitively

24

proven. No one appears to remember who told Secretary Abernathy to describe the rape as inappropriate touching.

Principal Blair does not know whether he believes CJC actually raped Doe. Assistant Principal Dunaway never formed an opinion on whether CJC raped Doe because the police never arrested CJC or charged him with rape. Dunaway believes a rape cannot occur unless prosecutors bring criminal charges against the alleged student rapist. Dunaway also believes Doe's decision to enter the bathroom makes CJC's conduct "different" because, in her mind, he was not "dragging a cave woman by the hair and pulling her into your cave as opposed to someone saying sure, I'll go with you."

Assistant Principal Terrell also never formed an opinion on whether CJC raped Doe because "[w]e turned it over to the police department for them to investigate it. That was not my place to make that decision." After examining the medical photographs documenting Doe's anal injuries, Terrell had no opinion on whether Doe was raped.

With one exception, the Board has not changed a single policy in response to CJC's rape of Doe. The Board decided to discontinue the one-day sexual harassment training workshop for administrators at the Madison County Administrator Academy. Otherwise, the Board has not changed its sexual harassment disciplinary policy and recordkeeping policies, nor has it altered the

25

way it investigates sexual harassment complaints. Sparkman has not changed its practice of assigning students to unsupervised janitorial duty as punishment for alleged sexual harassment. Principal Blair would not change any policies because "we did as good a job I think as you could do under the circumstances."

## F. Effect of Rape on Doe

After the rape on January 22, Doe continued attending Sparkman until she withdrew on March 26. She returned to North Carolina to finish eighth grade. Doe never received any assistance from the Board, in the form of counseling or otherwise, to deal with her trauma. Upon her return to North Carolina, Doe attended mental health counseling sessions and was prescribed medication for depression. Doe discussed the rape with her counselor and how it has affected her.

In seventh and eighth grade at Sparkman, Doe played intramural basketball. She stopped playing basketball at the end of her eighth-grade year because "I just didn't feel like I could do it anymore" and "I was just depressed." Doe has not participated in any extracurricular activities since leaving Sparkman. Due to the rape, Doe prefers to "be by myself" and does not "trust being at school anymore." Her grades have suffered because, even though she was diagnosed with bipolar disorder prior to the rape, her depression has been exacerbated. Doe's grades have gone up and down, sometimes earning As, Bs, and Cs, but sometimes receiving Fs.

*G.  Destruction of CJC's Paper Disciplinary File*

In a letter dated April 30, 2010, approximately three months after the rape, Principal Blair received from Doe's counsel a letter notifying him to preserve certain records relating to the January 22, 2010 personal injuries of Doe.  The letter stated:

> As you may be aware, my law firm represents [Doe] as a result of personal injuries resulting from an incident which occurred on January 22, 2010 at Sparkman Middle School.  We specifically request that the following evidence be maintained and preserved and not be destroyed, modified, altered, repaired, or changed in any matter [sic]:
>
> 1.    Any videos or documents pertaining to the above referenced incident.
>
> 2.    Any communications, including e-mails, regarding the incident.

Blair says he preserved all the records stemming directly from the January 22, 2010 rape of Doe.  Blair preserved no documents, other than the iNOW records, related to CJC's other alleged or proven infractions during the 2009-2010 school year.

27

## II.  PROCEDURAL HISTORY

### A.  *Doe's Complaint*

On September 23, 2010, Doe filed a complaint against the Board, CJC, Blair, Terrell, Dunaway, and Simpson.[7]  The complaint alleged (1) negligence against Blair, Terrell, Dunaway, and Simpson; (2) recklessness/wantonness against Blair, Terrell, Dunaway, and Simpson; (3) negligent/reckless/wanton hiring, training, retention and supervision against Blair, Terrell, and Dunaway; (4) the tort of outrage against Blair, Terrell, Dunaway, and Simpson; (5) a violation of Title IX, 20 U.S.C. § 1681, against the Board; and (6) a violation of the Equal Protection Clause and Substantive Due Process Clause, 42 U.S.C. § 1983, against all Defendants.  The complaint sought declaratory relief, injunctive relief, and damages.

### B.  *Motions for Summary Judgment*

The Board, Principal Blair, Assistant Principal Terrell, and Assistant Principal Dunaway collectively moved for summary judgment.  The district court granted summary judgment to the Board on the Title IX claims because CJC's sexual misconduct and violent behavior did not "constitute[] sexual harassment so severe that it was depriving female students of educational opportunities."

---

[7]  The complaint also named CJC as a defendant.  The district court dismissed the claims against CJC because he was an unrepresented minor and numerous attempts to appoint a guardian *ad litem* had proven unsuccessful.  That order of dismissal is not on appeal.

28

According to the district court, CJC's disciplinary history was not enough to give the Board actual knowledge of CJC's harassment of female students. The district court found that, even if the Board had actual knowledge, it was not deliberately indifferent because the disciplinary response to CJC was not clearly unreasonable.

The district court granted summary judgment to the Board, Blair, Dunaway, and Terrell on the § 1983 claims. The district court granted summary judgment to Blair, Dunaway, and Terrell on the Alabama negligent/wanton hiring claims, as well as the tort of outrage claims. The district court also granted summary judgment to Blair and Terrell on the Alabama negligence/wantonness claims because they were entitled to state-agent immunity. The district court denied summary judgment to Dunaway on the negligence/wantonness claims, however, because she acted beyond her authority by ratifying the sting operation.

In her own motion, Teacher's Aide Simpson moved for partial summary judgment on the tort of outrage and § 1983 claims. The district court granted the motion for partial summary judgment. After the district court's rulings on the two motions for summary judgment, the only pending counts were negligence/wantonness claims against Dunaway and Simpson.

Dunaway timely filed an interlocutory appeal from the district court's denial of summary judgment on the negligence/wantonness claims.[8]  The district court subsequently dismissed without prejudice the pending state law counts against Dunaway and Simpson because all claims over which the district court had federal question jurisdiction had been dismissed and the state-agent immunity issues were not settled under Alabama law.[9]  Doe timely appealed the orders granting summary judgment in favor of Defendants.  This Court granted the parties' joint motion to consolidate the appeals of Doe and Dunaway.

## III.  STANDARD OF REVIEW

We review de novo a grant or denial of summary judgment, viewing all facts and reasonable inferences in the light most favorable to the nonmoving party. *Bridge Capital Inv'rs, II v. Susquehanna Radio Corp.*, 458 F.3d 1212, 1215 (11th Cir. 2006).  The propriety of summary judgment on state-agent immunity and qualified immunity grounds is a question of law to be reviewed de novo.  *Taylor v. Adams*, 221 F.3d 1254, 1256–57 (11th Cir. 2000); *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996).  "Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a

---

[8]  We have jurisdiction to consider a public official's interlocutory appeal from an order denying her state-law immunity where the disputed issue is whether the official acted outside her discretionary authority.  *See Taylor v. Adams*, 221 F.3d 1254, 1260 n.9 (11th Cir. 2000).

[9]  *See* 28 U.S.C. § 1367(a) (authorizing a district court to decline to exercise supplemental jurisdiction if, *inter alia*, "the district court has dismissed all claims over which it has original jurisdiction").

30

matter of law." *Hallmark Developers, Inc. v. Fulton Cty., Ga.*, 466 F.3d 1276, 1283 (11th Cir. 2006); *see* Fed. R. Civ. P. 56(a).

## IV.  DISCUSSION

Doe raises five issues on appeal.  Doe argues the district court erred in granting summary judgment (1) to the Board on the Title IX claim; (2) to the Board, Blair, Dunaway, and Terrell on the § 1983 equal protection claims; (3) to Simpson on the § 1983 substantive due process claim; (4) to Blair on the negligence/wantonness claims; and (5) to Simpson on the tort of outrage claim.[10]

---

[10]  Doe also argues the district court erred in failing to draw a spoliation inference against all Defendants for the school officials' destruction of CJC's disciplinary record.  The district court did not abuse its discretion in denying Doe's request for an adverse spoliation inference. *See Mann v. Taser Int'l., Inc.*, 588 F.3d 1291, 1310 (11th Cir. 2009) (reviewing district court's decision regarding spoliation sanctions for abuse of discretion).  Under our precedent, "an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith." *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997). As the district court held, the timing and content of Doe's preservation letter do not establish Defendants destroyed CJC's 2009-2010 school year records in bad faith.  Instead, the Board continued to follow the customary document retention policy by which disciplinary files were shredded each summer.

With regard to timing, Blair received the preservation letter from Doe's counsel in early May 2010, but the original complaint was not filed until September 23, 2010.  Blair therefore received the letter roughly five months before Doe put the Board on explicit notice that she was bringing a Title IX claim whose success hinged on school officials' knowledge of CJC's sexual harassment history.  Furthermore, it is undisputed that the summer—the time period between the submission of the preservation letter and the filing of the complaint—was the customary time of year when school officials shredded paper disciplinary files.

The content of the preservation letter likewise supports the district court's denial of sanctions.  Notably, the letter did not request all of CJC's disciplinary records, but instead only the evidence "pertaining to" the "incident which occurred on January 22, 2010 at Sparkman Middle School."  Defendants did, in fact, preserve records stemming directly from the rape of Doe.  We note the narrow request for information in the preservation letter is not dispositive of Doe's spoliation claim because "the common-law obligation to preserve relevant material is not necessarily dependent upon the tender of a 'preservation letter.' " *Cache La Poudre Feeds, LLC*

31

In her consolidated appeal, Dunaway raises a single argument: the district court erred in denying her state-agent immunity against Doe's negligence/wantonness claims. We first address Doe's Title IX claim.

## A.  Legal Standard for Title IX Student-on-Student Sexual Harassment

Title IX states, in pertinent part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Although Title IX does not expressly permit private enforcement suits, the Supreme Court has found an implied private right of action for individuals to enforce Title IX through monetary damages actions. *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 76, 112 S. Ct. 1028, 1038 (1992); *Cannon v. Univ. of Chi.*, 441 U.S. 677, 717, 99 S. Ct. 1946, 1968 (1979).

The Supreme Court first addressed Title IX claims in the context of teacher-on-student sexual harassment. In *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 277, 118 S. Ct. 1989, 1993 (1998), the Court held § 1681

---

*v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 623 (D. Colo. 2007); *cf. Thompson v. U.S. Dep't of Housing and Urban Dev.*, 219 F.R.D. 93, 100 (D. Md. 2003) (holding a party's failure to request the preservation of documents "does not vitiate the independent obligation of an adverse party to preserve such information"). A poorly worded preservation letter does not necessarily shield a defendant from spoliation sanctions solely because she complied with the letter's narrow request. In this case, however, the Board's compliance with the plain meaning of the preservation letter is another factor pointing against bad faith.

creates a private cause of action against funding recipients for teacher-on-student sexual harassment when "an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct." The Court described the deliberate indifference standard as "an official decision by the [funding] recipient not to remedy the violation." *Id.* at 290, 118 S. Ct. at 1999.

One year later, in *Davis v. Monroe County Board of Education*, 526 U.S. 629, 633, 119 S. Ct. 1661, 1666 (1999), the Supreme Court held § 1681 creates a private cause of action for student-on-student sexual harassment. A Title IX funding recipient is liable for student-on-student harassment if it is "deliberately indifferent to sexual harassment, of which [it] has actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* at 650, 119 S. Ct. at 1675. The standard for student-on-student sexual harassment claims is far more rigorous than a claim for teacher-on-student harassment. *See id.* at 650–53, 119 S. Ct. at 1675–76.

Student-on-student sexual harassment rises to the level of actionable Title IX discrimination only if the harassment is "sufficiently severe." *Id.* at 650, 119 S. Ct. at 1674. The plaintiff must establish not only that the school district was deliberately indifferent to known acts of harassment, but also that the known

33

harassment was "so severe, pervasive, and objectively offensive that it denie[d] its victims the equal access to education that Title IX is designed to protect." *Id.* at 651–52, 119 S. Ct. at 1675.

The Court imposed this high standard to guard against the imposition of "sweeping liability." *Id.* at 652, 119 S. Ct. at 1675–76. Unlike an adult workplace, children "may regularly interact in a manner that would be unacceptable among adults." *Id.* at 651, 119 S. Ct. at 1675. Due to their immaturity, children at various ages will invariably engage in some forms of teasing, shoving, and name-calling that "target differences in gender." *Id.* at 651–52, 119 S. Ct. at 1675. Some risk of sexual harassment is inherent to the enterprise of public education, in particular, because public schools must educate even the most troublesome and defiant students.

We begin by clarifying the correct legal standard for student-on-student sexual harassment claims under Title IX. The parties dispute whether the district court applied the appropriate standard for evaluating the actual notice requirement of Doe's student-on-student harassment claim. The district court required Doe to prove the Board had actual notice of sexual harassment "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits."

34

Doe, with support from the United States Department of Education and United States Department of Justice (collectively, DOJ) acting as *amicus curiae*, argues the district court erred in applying a "heightened" notice requirement unsupported by law. According to Doe, a plaintiff must show only that allegations of sexual harassment alerted the school district that the harasser posed a "substantial risk" of engaging in "severe, pervasive, and objectively offensive" harassment against other students. After this showing, a plaintiff may then prove the harasser's conduct culminated in sexual harassment that was "so severe, pervasive, and objectively offensive" that it harmed the victim by depriving him or her of educational opportunities.

Doe's and the DOJ's proposed "substantial risk" standard lacks merit. The "substantial risk" standard emanates from teacher-on-student Title IX cases, whose requirements are not as rigorous as student-on-student cases. *See Davis*, 526 U.S. at 653, 119 S. Ct. at 1676 (noting that "[p]eer harassment, in particular, is less likely" to breach the Title IX guarantee of equal access to education than "teacher-student harassment"). All of the cases cited by Doe and the DOJ applying a "substantial risk" standard or similar language involved teacher-on-student harassment. *See Doe v. Bd. of Broward Cty., Fla.*, 604 F.3d 1248, 1254 (11th Cir. 2010) (teacher-on-student harassment); *Bostic v. Smyrna Sch. Dist.*, 418 F.3d 355, 360–61 (3d Cir. 2005) (same); *Williams v. Paint Valley Local Sch. Dist.*, 400 F.3d

360, 362 (6th Cir. 2005) (same); *see also Baynard v. Malone*, 268 F.3d 228, 240

(4th Cir. 2001) (Michael, J., dissenting in part) (same).

We hold a Title IX plaintiff must prove the funding recipient had actual

knowledge that the student-on-student sexual harassment was severe, pervasive,

and objectively offensive.  The plain language of *Davis* dictates this result:

> "[F]unding recipients are properly held liable in damages only where
> they are deliberately indifferent to sexual harassment, *of which they
> have actual knowledge*, that is so severe, pervasive, and objectively
> offensive that it can be said to deprive the victims of access to the
> educational opportunities or benefits provided by the school."

*Davis*, 526 U.S. at 650, 119 S. Ct. at 1675 (emphasis added).  The high burden of

*Davis* ensures school districts are not financially crippled merely because

immature kids occasionally engage in immature sexual behavior.  Simply put,

"[t]he Supreme Court has applied a more rigorous standard when a Title IX

plaintiff seeks damages against a school district for student-on-student

harassment."  *Sauls v. Pierce Cty. Sch. Dist.*, 399 F.3d 1279, 1284 (11th Cir.

2005).  Accordingly, the district court applied the correct standard to Doe's Title

IX claim.

B.  *Application of Legal Standard for Title IX Student-on-Student Sexual
    Harassment*

We now apply this legal standard to Doe's Title IX claim.  In *Williams v.

Board of Regents of University System of Georgia*, 477 F.3d 1282, 1292–99 (11th

Cir. 2007), this Court applied *Davis* and held a plaintiff seeking recovery for a

36

Title IX violation predicated on student-on-student sexual harassment must prove five elements.[11]

First, the defendant must be a Title IX funding recipient. *Id.* at 1293. Second, an "appropriate person" must have actual knowledge of the alleged discrimination or harassment. *Id.* (quotation omitted). Third, the discrimination or harassment—of which the funding recipient had actual knowledge under element two—must be "severe, pervasive, and objectively offensive." *Id.* (quotation omitted). Fourth, the plaintiff must prove "the funding recipient act[ed] with deliberate indifference to known acts of harassment in its programs or activities." *Id.* (quotation omitted). Fifth, the plaintiff must demonstrate the discrimination or harassment "effectively barred the victim's access to an educational opportunity or benefit." *Id.* at 1298 (quotation and internal alterations omitted).

Applying this test, the district court concluded no reasonable juror could find the Board had actual knowledge that CJC's behavior constituted sexual harassment so severe, pervasive, and objectively offensive as to deprive Doe of educational opportunities. For the reasons explained below, we disagree and reverse.

---

[11] In *Williams*, we described this test as comprising four elements, with the fourth element containing two parts: 4a and 4b. *Williams*, 477 F.3d at 1293, 1297–98. For purposes of this appeal, we apply *Williams* as a five-element test, designating 4a and 4b as separate elements. For the sake of clarity, we also rearrange our discussion of the elements in the following order: 1, 2, 4a, 3, 4b.

*1.  Is the Board a Title IX funding recipient?*

The first element requires Doe to prove the Board is a Title IX funding recipient. *See id.* at 1293. The parties do not address and therefore appear to agree the Board is a Title IX funding recipient. Doe succeeds on the first element.

*2.  Did the Board have actual knowledge of the sexual harassment and discrimination Doe faced?*

The second element requires Doe to prove an "appropriate person" capable of putting the Board on notice had "actual knowledge" of CJC's sexual harassment and discrimination. *See id.* We begin by identifying the appropriate persons capable of putting the Board on notice of CJC's sexual harassment. We then discuss whether the Board had actual knowledge of CJC's sexual harassment.

*a.  Appropriate persons*

The Supreme Court has explained that an "appropriate person" is an official of the recipient entity who "at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf." *Gebser*, 524 U.S. at 290, 118 S. Ct. at 1999. In *Floyd v. Waiters*, 171 F.3d 1264, 1264 (11th Cir. 1999), this Court elaborated on the "appropriate person" requirement, stating the school official must be "high enough up the chain-of-command that his acts constitute an official decision by the school district itself not to remedy the misconduct." Applying this standard, this Court held a school security guard was not an appropriate person. *Floyd v. Waiters*, 133 F.3d 786, 788,

793 & n.15 (11th Cir. 1998), *vacated by* 525 U.S. 802, 119 S. Ct. 33 (1998), *reinstated in* 171 F.3d 1264 (11th Cir. 1999).

The parties agree Principal Blair, Assistant Principal Dunaway, and Assistant Principal Terrell were appropriate persons capable of putting the Board on actual notice of sexual harassment and discrimination. The parties dispute, however, whether Teacher's Aide Simpson was an "appropriate person" such that her knowledge is attributable to the Board.

We conclude Teacher's Aide Simpson was not an "appropriate person" who could put the Board on notice of sexual harassment and discrimination. No evidence in the record suggests teacher's aides at Sparkman have the authority to discipline students for sexual harassment. *See Gebser*, 524 U.S. at 290, 118 S. Ct. at 1999. The principal and assistant principals alone possessed that authority. As a teacher's aide, Simpson had to answer to a teacher, the assistant principals, and the principal, and she was not high enough on the chain-of-command at Sparkman for her acts to "constitute an official decision by the school district itself not to remedy the misconduct." *See Floyd*, 171 F.3d at 1264. Accordingly, in evaluating whether the Board had notice of CJC's sexual harassment, we evaluate only the knowledge of Principal Blair and Assistant Principals Dunaway and Terrell.

### b. Actual knowledge

We now ask what the Board knew—vis-à-vis Principal Blair or Assistant Principals Dunaway or Terrell—about CJC's alleged harassment and discrimination. Under element two, we are concerned only with the Board's knowledge. *Williams*, 477 F.3d at 1293. The analysis of whether CJC's alleged harassment was sufficiently severe, pervasive, and objectively offensive is reserved for element three. The determination of whether the Board's response to CJC's alleged harassment was deliberately indifferent is reserved for element four.

The Board knew—again, vis-à-vis Blair, Dunaway, or Terrell—the following facts. The Board admits it had knowledge of CJC's disciplinary history that was tersely recorded in the iNOW database. The Board does not contest it had actual knowledge of CJC's unrecorded instances of alleged sexual harassment in January 2010. Administrators learned weeks before the rape that CJC had been propositioning girls to have sex in bathrooms. On January 13, 2010, ten days before the rape of Doe, the administrators learned CJC had allegedly inappropriately touched a female student. We recognize there is a dispute of fact as to whether Teacher's Aide Simpson informed Assistant Principal Dunaway a few minutes before the rape about her proposed sting operation and CJC's propositioning of Doe to have sex in the boys' bathroom. Construing the facts in favor of Doe for purposes of summary judgment, the Board (through Dunaway)

40

had actual knowledge of the use of Doe as rape bait for CJC in the sting operation and CJC's propositioning of Doe to have sex.  And it is undisputed that the Board became aware of the rape-bait scheme and the rape when Principal Blair interviewed Simpson and Doe and discovered these events.  At that point, the Board also definitively knew CJC's verbal harassment of Doe led Simpson to implement the sting operation.

3. *Was the sexual harassment and discrimination Doe faced, of which the Board had knowledge, severe, pervasive, and objectively offensive?*

As to the third element, we ask whether the sexual harassment and discrimination, of which the Board had actual knowledge, was sufficiently "severe, pervasive, and objectively offensive." *Davis*, 526 U.S. at 651, 119 S. Ct. at 1675; *see Williams*, 477 F.3d at 1294.  "Whether gender-oriented conduct rises to the level of actionable [Title IX] harassment . . . depends on a constellation of surrounding circumstances, expectations, and relationships, including, but not limited to, the ages of the harasser and the victim and the number of individuals involved." *Id.* (quotations and citations omitted).  To be severe, pervasive, and objectively offensive, the behavior must be serious enough to have a "systemic effect" of denying equal access to an education. *Id.* at 652, 119 S. Ct. at 1676.  A "single instance of sufficiently severe one-on-one peer harassment" cannot have such a systemic effect in light of "the amount of litigation that would be invited by

41

entertaining claims of official indifference to a single instance of one-on-one peer harassment." *Id.* at 652–53, 119 S. Ct at 1676.

This is a unique case because the administrators effectively participated in CJC's sexual harassment by setting Doe up in a rape-bait scheme involving CJC in order to "catch him in the act." Thus, in considering the third element, we examine and count (1) CJC's past sexual harassment of Doe and others; (2) Doe's complaints about CJC to the Board (through Simpson and Dunaway) to which the Board responded by having Doe participate in a sting operation with CJC; (3) the Board's "catch in the act" policy that motivated Simpson to conduct, and Dunaway to approve, a rape-bait scheme with CJC as a participant that directly harassed, injured, and impacted Doe further; and (4) after the rape, the Board's utter failure to respond to Doe's traumatic injury and experience orchestrated by the Board.

In *Williams*, this Court reversed the dismissal of a Title IX claim brought by a female student at the University of Georgia (UGA), who was gang-raped by three student-athletes in a dorm room. The *Williams* plaintiff alleged UGA had actual knowledge of the following forms of discrimination or harassment that she faced. 477 F.3d at 1294. UGA had actual knowledge of prior sexual harassment of women by the ringleader of the gang-rape, and then despite that conduct UGA recruited him to play basketball and admitted him as a student. *Id.* The plaintiff also alleged UGA had actual knowledge of the rape and the subsequent

42

discrimination of the plaintiff caused by the university's own inadequate response to the rape. *Id.*

This Court concluded that UGA's failure to supervise the ringleader on campus was deliberately indifferent in light of UGA's knowledge of his prior sexual misconduct at other schools. *Id.* at 1296. This Court also concluded that UGA again responded with deliberate indifference by waiting almost a year after the rape to conduct a disciplinary hearing, and by failing to take any precautions to prevent future attacks by, for example, removing the rapist from student housing or implementing a more protective sexual assault policy. *Id.* at 1296–97. As *Williams* shows, a school's deliberately indifferent response to sexual harassment can create Title IX liability.

Here, a jury similarly could find the Board's knowledge of CJC's prior sexual harassment on multiple occasions; the Board's catch in the act policy; Doe's complaints about CJC; the Board's knowing use of Doe as rape bait in its sting operation with CJC; and the Board's failure to respond at all, much less adequately, to Doe's allegations or the rape itself, were sufficiently "severe" and "objectively offensive" to satisfy the third element.

These facts differ markedly from the "rarely actionable, theoretical single incident mentioned in *Davis*." *Williams*, 477 F.3d at 1298. We conclude the harassment here is materially different because the physical act of penetration in

the bathroom was (1) preceded by CJC repeatedly propositioning Doe for sex for two weeks and (2) orchestrated by school officials during a botched rape-bait scheme with CJC.  Like the rape in *Williams* where the ringleader conspired with his friends beforehand to commit sexual assault, a jury could find CJC's rape of Doe was the culmination of "a continuous series of events," *id*, at 1298, and was therefore pervasive.  These are highly unique and extreme facts that will hopefully never again be repeated.  A jury could find CJC's rape of Doe was the culmination of CJC's two weeks of harassment and the school's choice to use Doe as bait for CJC's sexual harassment, and thus satisfies the third element.

4. *Was the Board deliberately indifferent to the sexual harassment and discrimination Doe faced?*

As to the fourth element, funding recipients are deliberately indifferent "only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648, 119 S. Ct. at 1674.  A clearly unreasonable response causes students to undergo harassment or makes them more vulnerable to it.  *See Williams*, 477 F.3d at 1295–96.  To survive a summary judgment motion, a Title IX plaintiff must present evidence from which a reasonable jury could conclude "the Title IX recipient's deliberate indifference to the initial discrimination subjected the plaintiff to further discrimination." *Id*. at 1296.  We therefore ask whether the Board's decision to use Doe as bait in a sting operation with CJC, a known and already disciplined sexual

44

harasser, combined with the Board's failure to change any sexual harassment policies after CJC's rape of Doe, was clearly unreasonable in light of the known circumstances. *See, e.g., Williams*, 477 F.3d at 1297 ("[The School] acted with deliberate indifference . . . when it responded to the January 14 incident [of rape.]").

We conclude a genuine dispute of material fact exists as to whether the Board's deliberate indifference to Doe's "initial discrimination subjected [Doe] to further discrimination" that prevented her from continuing to attend Sparkman. *Id.* at 1296. As outlined above, the Board's knowledge of CJC's sexual harassment, its catch in the act policy, its orchestration of a sting operation using Doe as bait for CJC's sexual activities, and its failure to help Doe in any way was patently odious. In addition, the Board made only one policy change: it discontinued a one-day sexual harassment training workshop for administrators at the Madison County Administrator Academy. Although Principal Blair believes the Board did not need to change any policies because "we did as good a job I think as you could do under the circumstances," a reasonable jury could disagree.

In evaluating whether the Board's above conduct was deliberately indifferent, a jury might conclude the Board's failure to revise its iNOW recordkeeping policy was clearly unreasonable. After the rape, a jury could find the Board should have known it needed to develop a more accurate system for

45

recording sexual harassment in order to adequately monitor and respond to student misconduct and complaints of sexual harassment. As an example, the Board recorded CJC's rape of Doe in CJC's disciplinary file as "[i]nappropriate touching a female in a boys' bathroom." In response to the allegations that CJC was harassing female students by propositioning them to have sex in bathrooms, the Board recorded the incident as "[d]isobedience" due to "[c]onstant[]distraction continued disruption of learning." The evidence reveals school officials never recorded CJC's placement in alternative school for "hugg[ing] a girl in the front of the cafeteria." School officials apparently did not find this incident worth recording, even though CJC had raped Doe three months earlier.

A jury could find the policy of entrusting the school secretary to make iNOW database entries through an *ad hoc,* rather than systematic, method of classifying sexual misconduct was flawed. As Assistant Principal Terrell conceded, the Board did not have a "normal policy" about iNOW recordkeeping. A jury could find the Board's failure to create an accurate and systematic iNOW database policy after CJC's rape of Doe was clearly unreasonable.

Additionally, a reasonable jury could find the Board's decision to continue shredding students' disciplinary paper records at the end of each year impeded school officials' ability to adequately respond to sexual harassment allegations against CJC. A jury could conclude the Board's policy prevented school officials

from "draw[ing] a connection" between CJC's January 2010 incidents and prior sexual harassment complaints.  *See Doe v. Bd. of Broward Cty., Fla.*, 604 F.3d 1248, 1261 (11th Cir. 2010).

The Board also has not revised its policy of assigning suspected sexual harassers to unsupervised janitorial duty.  In response to complaints that CJC was inappropriately touching girls, Principal Blair assigned CJC to 20 days of in-school suspension during which he was occasionally unsupervised.  A jury might find that, after CJC's rape of Doe, continuing to allow suspected sexual harassers to roam a middle school's halls unsupervised—as punishment for covertly attempting to have sex with girls in bathrooms—was clearly unreasonable.

A jury could find it was clearly unreasonable for the Board to decline to remedy the school administrators' practice of ignoring paper disciplinary records when deciding how to respond to sexual harassment allegations.  Principal Blair did not examine CJC's disciplinary records as part of his investigation of CJC.  Assistant Principal Dunaway did not check the supporting paper documentation that would have been in CJC's file regarding the October 28, 2009 "[i]nappropriate touching" infraction, the November 18, 2009 "refusing to obey driver and keep hands off a female student" infraction, and the November 25, 2009 "[k]issing" infraction.  A reasonable factfinder might conclude the Board's refusal to direct its officials to consider all the known circumstances, including the nature, pattern, and

47

seriousness of a student's conduct, was clearly unreasonable. *See Doe*, 604 F.3d at 1263 (stating funding recipients do not "satisfy their obligations under Title IX without ever evaluating the known circumstances at all").

A jury might also find it was clearly unreasonable for the Board not to improve its sexual harassment training. Teacher's Aide Simpson stated that despite her entreaties to Principal Blair and other faculty members, she and other teacher's aides received no training on how to handle complaints of sexual harassment. *See Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1178 (10th Cir. 2007) (holding funding recipient demonstrates deliberate indifference by failing "to provid[e] adequate training or guidance that is obviously necessary for implementation of a specific program or policy of the recipient"). Blair admitted the Board does not have a policy for annually revisiting its sexual harassment policy, and no records are kept about sexual harassment training. Further, there are genuine questions of fact and credibility regarding the quantity and quality of the Board's purported training. The Board has failed to produce any official documentation of staff training sessions. Blair can remember one workshop on sexual harassment over the past few years, but cannot remember the approximate date or details of the program. Assistant Principal Dunaway, despite being integrally involved in disciplining students for sexual harassment, was not aware the Code of Conduct had any section addressing sexual misconduct or harassment.

48

Blair could not remember the identity of the Title IX coordinator in 2010; did not know how employees would discover the identity of the Title IX coordinator; and students were not told who the Title IX coordinator was. *Cf. Williams*, 477 F.3d at 1296 (holding plaintiff adequately alleged deliberate indifference when school "fail[ed] to inform its student-athletes about the applicable sexual harassment policy"). When the Board's sexual harassment policies are considered collectively, a reasonable jury could find the Board's choice to do nothing to improve its sexual harassment policies was clearly unreasonable.

Given all these events and circumstances considered cumulatively, there is a genuine issue of fact as to whether both the Board's action and inaction were deliberately indifferent. We do not say that any one action or inaction suffices. The deliberate indifference standard is rigorous and hard to meet. But the cumulative events and circumstances here, viewed in the light most favorable to Doe, are enough to establish deliberate indifference under Title IX.

> 5. *Did the Board's deliberate indifference to the harassment and discrimination effectively bar Doe's access to an educational opportunity or benefit?*

Turning to element five, a genuine dispute of material fact exists as to whether CJC's sexual harassment, combined with the Board's use of Doe in a rape-bait scheme involving CJC, "effectively bar[red] [Doe's] access to an

49

educational opportunity or benefit." *See Davis*, 526 U.S. at 633, 119 S. Ct. at 1666.

A reasonable jury could find the Board's overall conduct and its clearly unreasonable response to the rape prevented Doe from continuing her education at Sparkman. Although Doe unenrolled and moved to North Carolina approximately two weeks before CJC finished his stint at alternative school and returned to Sparkman, Doe's withdrawal does not bar a finding that the Board denied her an opportunity to continue attending Sparkman. In light of the incomprehensible rape-bait scheme and the resulting severe suffering Doe endured on January 22, combined with the refusal of school personnel to acknowledge the rape or begin implementing new sexual harassment prevention or recordkeeping policies, her withdrawal was reasonable and expected. *See Williams*, 477 F.3d at 1297 (holding student's withdrawal after rape was "reasonable and expected" and did not foreclose fact that defendant's deliberate indifference denied her an opportunity to continue attending the school). A person in Doe's position could have no confidence in a school system that orchestrates a rape-bait scheme and whose disciplinary file describes CJC's rape of her as "[i]nappropriate touching a female in a boys' bathroom." Indeed, her choice to withdraw now seems prescient because, only one month after CJC returned to Sparkman, school officials had "additional problems" with him, including "hugg[ing] a girl in the front of the

50

cafeteria." Had Doe declined to withdraw from Sparkman, she might have again been CJC's victim.

Drawing all reasonable inferences in favor of Doe, a jury could find CJC's sexual harassment, combined with the Board's rape-bait scheme involving CJC, "had a concrete, negative effect" on her ability to receive an education. *Davis*, 526 U.S. at 654, 119 S. Ct. at 1676. Doe missed time at school due to the rape and had to transfer due to the school's clearly unreasonable response. She now attends counseling sessions, takes medication for depression, no longer participates in extracurricular activities like basketball, and her grades have suffered. Doe has satisfied element five.

Doe has satisfied all five elements necessary to create a genuine dispute of fact on her Title IX student-on-student sexual harassment claim. We therefore reverse the district court's grant of summary judgment to the Board.

## C. Section 1983 Equal Protection Claims

Next we consider Doe's 42 U.S.C. § 1983 equal protection claims against the Board, Blair, Dunaway, Simpson, and Terrell. Section 1983 allows persons to sue individuals or municipalities acting under the color of state law for violations of federal law. One such law is the Equal Protection Clause, U.S. Const. amend. XIV, § 1, which confers a federal constitutional right to be free from sex

discrimination.  *See, e.g., Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 273, 99 S.

Ct. 2282, 2293 (1979).

Although Title IX and § 1983 sexual harassment claims are similar, our

resolution of Doe's Title IX suit does not dictate the result of our § 1983 analysis.

The differences in Title IX and § 1983, in addition to the parties' framing of the

issues, may lead to results that are seemingly inconsistent.  For instance, in this

case we concluded the Board may be held liable under Title IX, but, as explained

below, we conclude the Board may not be held liable under § 1983.

Doe has framed her § 1983 equal protection claim against the Board

differently than her Title IX claim.  Under Title IX, Doe has asserted the overall

conduct of the appropriate school officials—Blair, Dunaway, and Terrell—whose

conduct was attributable to the Board, was deliberately indifferent.  By contrast,

under § 1983 where *respondeat superior* is unavailable,  Doe has alleged only that

(1) the Board's allegedly inadequate training policies and (2) the "catch in the act"

policy amount to deliberate indifference.  In contrast to her Title IX claim, Doe has

thus narrowly framed her § 1983 claim against the Board.

Title IX and § 1983 are different.  As the Supreme Court has said, Title IX's

and § 1983's protections "are narrower in some respects and broader in others."

*Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 256, 129 S. Ct. 788, 796

(2009).  For instance, Title IX is enforceable against institutions and programs that

receive federal funds, but does not authorize suits against individuals. *Id.* at 257, 129 S. Ct. at 796. Section 1983 equal protection claims, by contrast, may be brought against individuals and municipalities. *Id.* The standards for establishing liability under each mechanism also "may not be wholly congruent." *Id.* at 257, 129 S. Ct. at 797. Under Title IX, for example, a plaintiff can establish school district liability by showing an appropriate school official responded to sexual harassment with deliberate indifference. *Id.* A plaintiff bringing a similar § 1983 claim must show a municipal custom, policy, or practice caused the harassment. *Id.* at 257–58, 129 S. Ct. at 797.

Now that we have discussed the relationship between § 1983 and Title IX, we analyze Doe's § 1983 claims. Doe argues the district court erred in granting summary judgment to Defendants on her § 1983 claims because Defendants violated her federally guaranteed right to equal protection by subjecting her to sexual harassment. Specifically, Doe contends Defendants exhibited deliberate indifference by failing to adequately prevent and respond to CJC's sexual harassment. We first analyze the Board's municipal liability. We then examine the individual defendants' liability.

*1. The Board*

The Board, which is a municipality, may not be held liable for constitutional deprivations on the theory of *respondeat superior*. *Denno v. Sch. Bd. of Volusia*

53

*Cty., Fla.*, 218 F.3d 1267, 1276 (11th Cir. 2000).  Instead, "municipal liability is limited to action for which the municipality is actually responsible."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–80, 106 S. Ct. 1292, 1298 (1986).  A municipality therefore may be held liable "only if such constitutional torts result from an official government policy, the actions of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law."  *Denno*, 218 F.3d at 1276.

Doe contends the Board is subject to municipal liability for adopting the "catch in the act" policy and allegedly inadequate training policies that led Simpson and Dunaway to formulate the rape-bait sting operation.  Assuming, without deciding, that these policies are attributable to the Board, the district court did not err in granting summary judgment.

"[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality."  *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 1388 (1997).  The plaintiff "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  *Id.*  The Supreme Court has noted the "deliberate indifference" standard under § 1983 is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his

54

action." *Id.* at 410, 117 S. Ct. at 1391. A court must "carefully test the link between the policymaker's inadequate decision and the particular injury alleged." *Id.* at 410. The evidence must show the deprivation of the constitutional right is a "plainly obvious consequence" of the municipal action. *Id.* at 411, 117 S. Ct. at 1392.

The Board could not have foreseen a rape-bait scheme that required an eighth-grade student to voluntarily subject herself to sexual harassment as a "known or obvious consequence" of the "catch in the act" policy or its training policies. *See id.* at 410, 117 S. Ct. at 1391. While the Board's policies may have made a violation of Doe's rights "more *likely*" by motivating Simpson to engineer the rape-bait operation, that alone does not give rise to an inference that the policies "produced a specific constitutional allegation." *See McDowell v. Brown*, 392 F.3d 1283, 1292 (11th Cir. 2004) (quoting *Brown*, 520 U.S. at 411, 117 S. Ct. at 1382). It is not obvious a teacher's aide would craft a sting operation like the one here in response to (1) the Board's allegedly inadequate training policies or (2) a policy requiring witnesses, physical evidence, or an admission of guilt before disciplining a student for sexual harassment. We accordingly affirm the grant of summary judgment to the Board on Doe's § 1983 claim.

### 2. *Principal Blair*

Doe asserts the district court erred in granting summary judgment to

Principal Blair on her § 1983 claim.  She says Blair's inadequate response to CJC's known sexual harassment deprived her of equal protection, and he is not entitled to qualified immunity because he had fair warning his actions violated the Equal Protection Clause.  We agree and reverse.

"[A] governmental official . . . may be held liable under section 1983 upon a showing of deliberate indifference to known sexual harassment."  *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1250 (10th Cir. 1999); *see Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1300–02 (11th Cir. 2007) (discussing government officials' liability under § 1983 arising from "right to be free from sex discrimination");  *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (applying "deliberate indifference" standard for § 1983 deprivation of constitutional right to be free from sexual harassment).  In order to prevail on a claim of deliberate indifference to sexual harassment, a plaintiff must prove the individual defendant "actually knew of and acquiesced in" the discriminatory conduct.  *Murrell*, 186 F.3d at 1250 (quotation omitted).  Qualified immunity, however, offers complete protection for individual government officials performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982).

56

When a court concludes the defendant was engaged in a discretionary function, "the burden shifts to the plaintiff to show that the defendant is *not* entitled to qualified immunity." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004). The parties do not dispute that, at all times relevant to this appeal, Blair acted in his discretionary capacity. Doe consequently bears the burden of showing "(1) [Blair] violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *See id.*

With regard to the first prong of qualified immunity analysis, there is a genuine dispute of material fact as to whether Principal Blair violated Doe's constitutional right to equal protection. For the reasons explained above in our Title IX analysis, *supra* Section IV.B(4), a jury could find Blair's actions after CJC's rape of Doe amounted to deliberate indifference. The evidence shows Blair crafted and implemented Sparkman's sexual harassment and recordkeeping policies. A jury could find that despite these policies' glaring inadequacies that were exposed by CJC's rape of Doe, Blair did virtually nothing in response. The only change was to discontinue the one-day sexual harassment training workshop for administrators at the Madison County Administrator Academy. Viewing the evidence favorably to Doe, doing nothing was a deliberately indifferent response that subjected Doe to further sexual harassment by depriving her of the opportunity to continue attending Sparkman.

As to the second prong, when viewing the evidence favorably to Doe, Principal Blair violated a clearly established right.  A right may be clearly established for qualified immunity purposes in one of three ways: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Lewis v. City of W. Palm Beach, Fla.*, 561 F.3d 1288, 1291–92 (11th Cir. 2009) (citations omitted). Doe has confined her argument to the second of these methods.  Under this method, "every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *See, e.g., Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002); *see also Hope v. Pelzer*, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516 (2002) (the "salient question" is whether the state of the law gave "fair warning" the conduct was unconstitutional).

The relevant question is whether a reasonable government official in Blair's position as principal could have believed that "doing nothing" to reform Sparkman's sexual harassment and recordkeeping policies in response to CJC's rape of Doe was lawful, in light of clearly established law.  *See Cross v. State of Ala., State Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490, 1503

58

(11th Cir. 1995).  Viewing all reasonable inferences in favor of Doe, we conclude an official in Blair's position would not have believed doing nothing was lawful in light of the clearly established principle that deliberate indifference to sexual harassment is an equal protection violation.  *See, e.g.*, *Doe v. Sch. Bd. of Broward Cty., Fla.*, 604 F.3d 1248, 1261 (11th Cir. 2010) (finding deliberate indifference when the principal "effectively did nothing" in response to sexual harassment).  We reverse the district court's grant of summary judgment to Blair on Doe's § 1983 equal protection claim.

### 3.  Assistant Principal Dunaway

The district court also erred in granting summary judgment to Assistant Principal Dunaway on Doe's § 1983 equal protection claim.  The district court found Dunaway was entitled to qualified immunity because it could not identify sufficiently similar case law involving a sexual harassment sting operation.  This was error.  Drawing all reasonable inferences in favor of Doe, Dunaway acquiesced to and ratified Teacher's Aide Simpson's plan to send Doe alone into a bathroom with a known sexual harasser and have Doe pretend to initially welcome the harasser's sexual advances.  It is not surprising the district court could not find similar case law.  That is because "every objectively reasonable government official facing the circumstances" would know this irresponsible plan violated the Equal Protection Clause.  *See Vinyard*, 311 F.3d at 1351.  We therefore reverse.

59

### 4. *Teacher's Aide Simpson*

Teacher's Aide Simpson is not entitled to qualified immunity for the same reason as Assistant Principal Dunaway: she participated in using Doe as rape bait for CJC's sexual harassment in the sting operation. The only difference between their conduct is that Simpson contrived the sting operation, whereas Dunaway ratified it. We reverse the district court's grant of summary judgment to Simpson on Doe's § 1983 equal protection claim.

### 5. *Assistant Principal Terrell*

We affirm the district court's grant of summary judgment to Assistant Principal Terrell. Terrell is entitled to qualified immunity because the record does not show she violated Doe's constitutional right to equal protection. *Holloman*, 370 F.3d at 1264 (stating official is entitled to qualified immunity if plaintiff fails to show "the defendant violated a constitutional right"). Unlike Principal Blair, Terrell was not ultimately responsible for Sparkman's sexual harassment policies. As a subordinate to Blair, she could not dictate the response to CJC's rape of Doe. Blair's deliberately indifferent response consequently cannot be attributed to Terrell. Unlike Assistant Principal Dunaway and Teacher's Aide Simpson, there is no evidence Terrell acquiesced to or ratified the plan to use Doe as rape bait for CJC in the sting operation. Thus, Dunaway's and Simpson's deliberate indifference also cannot be attributed to Terrell.

60

## D. Section 1983 Substantive Due Process Claim

The district court did not err in granting summary judgment to Simpson on Doe's substantive due process claim. This Court has held deliberate indifference is not, without more, a basis for finding substantive due process liability in cases arising in the school context. *See Davis v. Carter*, 555 F.3d 979, 983–84 (11th Cir. 2009). Doe's effort to state a claim for a violation of her right to substantive due process fails. Simpson is entitled to qualified immunity, and we affirm the district court's grant of summary judgment.

## E. Negligence/Wantonness Against Principal Blair

We now turn from Doe's federal claims to her Alabama state law claims brought pursuant to the district court's supplemental jurisdiction. *See* 28 U.S.C. § 1367(a). Doe argues the district court erred in granting summary judgment to Principal Blair for state law negligence/wantonness. The district court held Blair was entitled to state-agent immunity under Alabama law. Doe contends Blair is not entitled to state-agent immunity because he (1) acted beyond his authority by failing to comply with his Title IX obligation to prevent, eliminate, and address the effects of sexual harassment; (2) acted in bad faith by failing to impose effective discipline when he assigned CJC to unsupervised in-school suspension; and (3) mistakenly interpreted Title IX by improperly conducting investigations of sexual harassment allegations. We affirm because, as discussed below, Doe has

not shown any of the exceptions to Alabama state-agent immunity apply to Blair's conduct.

Under Alabama law, "[s]tate-agent immunity protects state employees, as agents of the State, in the exercise of their judgment in executing their work responsibilities." *Ex parte Hayles*, 852 So. 2d 117, 122 (Ala. 2002). The Alabama Supreme Court has established a burden-shifting framework for application of the state-agent immunity test. *Ex parte Estate of Reynolds*, 946 So. 2d 450, 452, 454–55 (Ala. 2006). A state agent initially bears the burden of demonstrating that she was acting in a discretionary function that would entitle her to immunity. *Id.* If the state agent makes such a showing, the burden shifts to the plaintiff to show the state agent "act[ed] willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Ex parte Cranman*, 792 So. 2d 392, 402 n.13 (Ala. 2000).

Doe concedes Principal Blair has met his initial burden because his handling of student disciplinary matters is a discretionary function. The only question is whether Blair lacks state-law immunity because he (1) acted beyond his authority by violating Title IX, (2) acted in bad faith, or (3) acted based on a mistaken interpretation of Title IX. We consider each exception in turn.

*1. Acting beyond authority*

First, Doe contends Principal Blair is not entitled to state-agent immunity because he acted "beyond his authority" in failing to comply with his Title IX obligation to prevent sexual harassment. Even if we accepted the dubious proposition that Title IX imposes obligations on Blair—who is an individual school official, not a Title IX funding recipient—he did not forfeit state-agent immunity by acting beyond his authority. As the Alabama Supreme Court has explained, a state agent acts beyond his authority when he "fail[s] to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist." *Ex parte Butts*, 775 So. 2d 173, 178 (Ala. 2000). The rules or regulations must be so "detailed" as to "remove a State-agent's judgment in the performance of required acts." *Ex parte Spivey*, 846 So. 2d 322, 333 (Ala. 2002) (quotation omitted).

Doe has not alleged how Title IX creates rules or regulations so detailed as to "remove a State-agent's judgment in the performance of required acts." *See id.* Doe cites only generally to Title IX's directive that funding recipients eliminate sexual harassment, prevent its recurrence, and address its effects. Indeed, Doe has not cited to any specific rule. The failure to abide by a "broadly stated, general safety policy," as opposed to a "detailed rule or checklist," is insufficient to abrogate state-agent immunity. *Bayles v. Marriott*, 816 So. 2d 38, 41–42 (Ala.

63

Civ. App. 2001).

### 2. *Bad faith*

Moving to the second exception to state-agent immunity, Doe contends Principal Blair acted in bad faith because he failed to discipline CJC harshly enough. Bad faith, however, requires more than a showing of incompetence. Bad faith "is not simply bad judgment or negligence. It imports a dishonest purpose and means a breach of known duty . . . through some motive of self-interest or ill will." *Gulf Atl. Life Ins. Co. v. Barnes*, 405 So. 2d 916, 924 (Ala. 1981); *see also Ex parte Turner*, 840 So. 2d 132, 136 (Ala. 2002) (applying state-agent immunity where, even though state official exercised poor judgment, evidence showed he acted in "good faith"). Doe has not pointed to evidence from which a jury could infer Blair's disciplinary response to CJC was motivated by self-interest or ill will towards her.

### 3. *Mistaken Interpretation of Law*

Third, Doe argues Principal Blair is not entitled to state-agent immunity because he acted under a mistaken interpretation of the law. Even assuming Title IX imposes a personal obligation on Blair, and even further assuming Blair's allegedly inadequate disciplinary response to CJC's conduct was caused by a misinterpretation of Title IX's requirements, this exception does not remove Blair's state-agent immunity.

64

Not every innocent misinterpretation of the law revokes an official's state-agent immunity under Alabama law.  If nothing more were required than an innocent misinterpretation of the law, "that exception would 'swallow' the whole of the general rule of immunity itself" because "any misstep by any state employee or other state agent that wrongs another can be said to be beyond his or her authority and/or committed under a mistaken interpretation of the law." *Segrest v. Lewis*, 907 So. 2d 452, 456 (Ala. Civ. App. 2005).  For that reason, the misinterpretation of the law must be coupled with willfulness, maliciousness, or bad faith to "pull the agent out from under the umbrella of state-agent immunity." *Id.*  The evidence does not show Principal Blair acted with willfulness, maliciousness, or bad faith.

None of the exceptions to Alabama state-agent immunity are applicable to Blair.  We accordingly affirm the district court's grant of summary judgment to Blair on the negligence/wantonness claims.

*F.  Negligence/Wantonness Against Dunaway*

In her consolidated interlocutory appeal, Assistant Principal Dunaway argues the district court erred in denying her state-agent immunity for negligence/wantonness on the basis that she acted beyond her authority.  The district court found that, viewing the evidence in the light most favorable to Doe, Dunaway ratified Teacher's Aide Simpson's plan to use Doe as bait to catch CJC

65

in the act of sexual harassment.  The district court concluded Dunaway exceeded

her authority by ratifying the rape-bait scheme rather than reporting CJC's sexual

harassment to Principal Blair in accordance with the Policy Manual, which

required a school official who receives a complaint of sexual harassment to report

that complaint to the principal.

We affirm the district court's denial of state-agent immunity to Assistant

Principal Dunaway.  Again, under Alabama law, a state official acts beyond her

authority when she fails to comply with a policy that has "remove[d] a State-

agent's judgment in the performance of required acts."  *Ex parte Spivey*, 846 So.

2d at 333.  The Alabama Supreme Court's decision in *N.C. v. Caldwell*, 77 So. 3d

561 (Ala. 2011), is particularly instructive on the application of this standard when,

as here, a school official has allegedly contravened a school policy.[12]

In *Caldwell*, the plaintiff, a seventh-grade girl, was raped by an older male

student after gym class.  *Id.* at 562.  Defendant Caldwell, the girl's gym teacher,

had assigned the male student to serve as a student aide during the gym class,

despite evidence that other female students informed Caldwell the aide had

directed inappropriate sexual comments toward them.  *Id.* at 562–63.  Caldwell

moved for summary judgment on the basis of state-agent immunity.  *Id.* at 563–65.

---

[12]  Dunaway contends on appeal that *L.N. v. Monroe County Board of Education*, 141 So. 3d 466 (Ala. 2013) (per curiam) (no opinion), overruled *Caldwell*.  Her reliance on that decision is misplaced.  *See* Ala. R. App. P. 53(d) (stating "no opinion" affirmance orders "shall have no precedential value and shall not be cited in argument or briefs and shall not be used by any court within this state").

Plaintiff responded Caldwell was not entitled to immunity because he "acted beyond his authority" by appointing the male student as his aide and by failing to report previous complaints of sexual harassment. *Id.* at 566.

The Alabama Supreme Court reversed the grant of summary judgment to Caldwell because he failed to follow two school policies. *Id.* at 568–69. First, the faculty handbook said, "Any student not scheduled for a class should not attend that class." *Id.* at 569. Since the male student had not been assigned to Caldwell's gym class, there was a genuine issue of material fact as to whether Caldwell acted beyond his authority by appointing the student as an aide for that class. *Id.* Second, the school's code of conduct provided "it shall also be a violation of board policy for any teacher to tolerate sexual harassment." *Id.* (alterations in original omitted). The court held there was a genuine issue of material fact as to whether Caldwell acted beyond his authority by failing to report the other girls' complaints of sexual harassment. *Id.*

Based on *Caldwell*, the terms of the Policy Manual are sufficiently detailed under Alabama law to create a genuine issue of material fact as to whether Dunaway acted beyond her authority by failing to report Doe's sexual harassment complaints to Principal Blair. Under the Policy Manual, the school official to whom a complaint of sexual harassment is made "shall make the complaint known to the [p]rincipal of the school, except in cases where the complaint is against the

67

[p]rincipal." The principal "shall investigate the complaint and take appropriate action." This language is certainly more narrowly focused than the directive in *Caldwell* that no teacher may "tolerate sexual harassment," *id.* at 569. Because the district court did not err in denying Dunaway state-agent immunity, we affirm.

## G. Tort of Outrage Against Simpson

Doe next argues the district court erred in granting summary judgment to Teacher's Aide Simpson on her Alabama state law claim for the tort of outrage. We agree and reverse.[13]

Under Alabama law, the tort of outrage requires the plaintiff to show "(1) the actor intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from his conduct; (2) the conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff distress; and (4) that the distress was severe." *Harris v. McDavid*, 553 So. 2d 567, 569–70 (Ala. 1989). We consider each element in turn.

### 1. Known or Should Have Known

First, a reasonable jury could conclude Teacher's Aide Simpson "should have known" emotional distress was likely to result from her decision to send Doe into the bathroom alone with CJC to act as bait for his sexual harassment.

---

[13] Simpson has not asserted a state-agent immunity defense. *See Ryan v. Hayes*, 831 So. 2d 21, 27–28 (Ala. 2002) (stating state-agent immunity doctrine applies to "*asserted* State-agent-immunity defense") (emphasis added).

68

According to Simpson's own affidavit, she knew CJC "had been repeatedly propositioning other female students to have sex in the boys' bathroom." On January 21, 2010, Doe told Simpson CJC had been asking her to have sex, and Doe sought Simpson's guidance again on January 22 about how to stop the harassment. In her meeting with Assistant Principal Dunaway regarding her plan to use Doe as bait for CJC, Simpson said, "I hope this is legal. I don't know what I'm doing."

From all this evidence, a reasonable jury could conclude Simpson knew the significant danger CJC posed to Doe and severely doubted the legality of her conduct, presumably due to the risk the plan could misfire and an attack or rape could occur. Despite her consciousness of this risk, Simpson proceeded with the sting operation. Moreover, she did not even help personally oversee the operation because, after speaking to Dunaway and Hallman, Simpson believed "someone else was handling the situation, so I returned to the gym." A jury could find Simpson should have known that sending Doe to meet CJC alone in a bathroom and using Doe as bait to catch CJC was likely to cause emotional distress, especially when Simpson declined to personally monitor the sting operation.

### 2. Extreme and Outrageous Conduct

Moving to the second element of Doe's tort claim, a reasonable jury could find Simpson's conduct was extreme and outrageous. The Alabama Supreme Court's decision in *Henry v. Georgia-Pacific Corp.*, 730 So. 2d 119 (Ala. 1998),

illustrates the type of behavior that is considered extreme and outrageous under Alabama law. In *Henry*, the defendant-employer required the plaintiff-employee to attend counseling sessions. *Id.* at 119. After the counselor made improper sexual comments and solicitations during these sessions, the plaintiff notified her employer of the harassment. *Id.* at 120. Nonetheless, the employer told her the sessions were mandatory, which led her to continue the sessions until the counselor stopped visiting. *Id.* The court reversed the grant of summary judgment to the employer, stating a reasonable juror could conclude that requiring the plaintiff to attend counseling sessions with a known sexual harasser constituted extreme and outrageous conduct. *Id.* at 121.

Likewise, a reasonable jury could conclude Simpson's conduct, like the employer's conduct in *Henry*, constitutes extreme and outrageous conduct. Simpson, with prior knowledge of CJC's harassment, pressured a vulnerable middle school student to subject herself to his sexual advances alone in a bathroom, despite the obvious risks accompanying the plan. As in *Henry*, a jury deserves to decide this issue because "[e]gregious sexual harassment can amount to the tort of outrage." *Id.*

### 3. Causation

With regard to the third element, a reasonable jury could find Simpson caused Doe's emotional distress. Under Alabama law, foreseeability is the "key"

70

to proximate causation.  *Vines v. Plantation Motor Lodge*, 336 So. 2d 1338, 1339 (Ala. 1976).  A person who "by some act or omission sets in motion a series of events[] is not responsible for consequences of intervention of another agency, unless at the time of his original act or omission, the act of the intervening agency could reasonably be foreseen."  *Id.*  In simple terms, where the act of an intervening agent is reasonably foreseeable, a defendant may be held liable for damages caused by that agent.  *See* Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 19 cmt. d (Am. Law Inst. 2010) ("[R]isk is evaluated by reference to the foreseeable . . . probability of harm of a foreseeable severity.").  A jury could find Simpson proximately caused Doe's emotional distress because CJC's rape of Doe was a reasonably foreseeable consequence of the sting operation.  Any plan that involves placing a middle school student alone in a bathroom with a known sexual harasser and asking the student to feign sexual interest in the harasser poses a high risk of emotional distress.

### 4.  *Severity of Emotional Distress*

As to the fourth element, a jury could conclude the emotional distress Simpson caused was severe.  It is hard to imagine what could cause emotional distress more severe than the psychological trauma of rape, and the record is replete with evidence about the anguish Doe has suffered.  We reverse the grant of

71

summary judgment to Simpson because her conduct satisfies all four elements of the tort of outrage.

## V.  CONCLUSION

We reverse the grant of summary judgment to the Board on Doe's Title IX claim.  To prevail on a student-on-student sexual harassment claim, a plaintiff must prove the funding recipient had actual knowledge the sexual harassment was severe, pervasive, and objectively offensive.  Applying this standard, there is a genuine dispute of material fact as to whether Doe has satisfied all five elements necessary to succeed under Title IX.

Under element one, the parties do not contest the Board is a Title IX funding recipient.  Under element two, Blair, Dunaway, and Terrell were appropriate persons capable of putting the Board on notice of sexual harassment and discrimination, but Simpson was not.  A jury could find the Board learned all of the facts leading up to the rape and the fact that CJC had raped Doe.

As to element three, the harassment and discrimination Doe faced—of which the Board had knowledge—was severe, pervasive, and objectively offensive. CJC's sexual harassment of Doe was pervasive because he propositioned Doe for two weeks, school officials orchestrated the sting operation, and the sting operation resulted in the rape.

With regard to element four, a jury could find the Board clearly acted unreasonably and therefore was deliberately indifferent to the sexual harassment and discrimination Doe faced. Under element five, a jury could find the Board's deliberate indifference barred Doe's opportunity to continue her education at Sparkman. Since there are genuine questions of fact, the district court erred in granting summary judgment to the Board on Doe's Title IX claim.

We affirm the grant of summary judgment to the Board on Doe's § 1983 claim. Simpson's rape-bait scheme was not a known or obvious consequence of the "catch in the act" policy or the Board's allegedly inadequate training policies.

We reverse the grant of summary judgment to Blair on Doe's § 1983 equal protection claim. There is a genuine dispute of material fact as to whether Blair violated Doe's constitutional right to equal protection by acting with deliberate indifference to the rape of Doe. Viewing the evidence favorably to Doe, Blair violated clearly established law. No reasonable official in Blair's position would have believed doing nothing to reform Sparkman's sexual harassment policies was lawful in light of the clearly established principle that deliberate indifference to sexual harassment is an equal protection violation.

We reverse the grant of summary judgment to Dunaway on Doe's § 1983 equal protection claim. Viewing the evidence favorably to Doe, Dunaway acquiesced to and ratified the sting operation. She is not entitled to qualified

73

immunity because every objectively reasonable government official facing the circumstances would have known the plan to use Doe as rape bait violated the Equal Protection Clause. For the same reason, we reverse the grant of summary judgment to Simpson on Doe's § 1983 equal protection claim.

We affirm the grant of summary judgment to Terrell on Doe's § 1983 equal protection claim because Terrell is entitled to qualified immunity. Unlike Blair, Terrell could not dictate the school's response to CJC's rape of Doe, and, unlike Dunaway, there is no evidence she ratified the sting operation.

We affirm the grant of summary judgment to Simpson for the alleged § 1983 substantive due process violation. Simpson is entitled to qualified immunity because deliberate indifference is not, without more, a basis for finding substantive due process liability in cases arising in the school context.

Moving to the state law claims, we affirm the grant of summary judgment to Blair for negligence/wantonness because he is entitled to state-agent immunity. Doe has not shown any of the exceptions to Alabama state-agent immunity apply to Blair's conduct. We affirm the denial of summary judgment to Dunaway. She is not entitled to state-agent immunity because there is a genuine dispute as to whether she acted beyond her authority by failing to report CJC's sexual harassment to Blair and instead ratifying Simpson's sting operation. Finally, we reverse the grant of summary judgment to Simpson for the tort of outrage because

74

a jury could find Simpson should have known that emotional distress was likely to result from the sting operation, using Doe as rape-bait was extreme and outrageous, the sting operation caused Doe's distress, and that distress was severe.

In light of the foregoing reasons, the district court's summary judgment orders are affirmed in part and reversed in part, and this case is remanded.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**