[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 20-11542
Non-Argument Calendar
_____

D.C. Docket No. 8:17-cv-02874-SDM-AAS

SAMANTHA GARRETT,

Plaintiff-Appellant,

versus

UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES,

Defendant-Appellee.
_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(September 10, 2020)

Before MARTIN, ROSENBAUM, and BRASHER, Circuit Judges.

PER CURIAM:

Appellant Samantha Garrett appeals the district court's grant of Appellee University of South Florida's (USF) motion for summary judgment on her Title IX claims. Garrett, a victim of student-on-student sexual harassment, seeks damages

from USF for: (1) failing to adequately respond to her report of another student's sexual misconduct; and (2) retaliating against her after she complained about USF's handling of her Title IX complaint. The law allows her neither; the district court correctly granted summary judgment. We affirm.

## I.    BACKGROUND

Under the summary judgment standard, the following facts are taken in the light most favorable to Garrett and all factual disputes are resolved in her favor.

In fall 2015, Samantha Garrett began a doctoral program in psychology at USF, where she met and became close friends with Andrew Thurston, who was already a Ph.D. candidate. On November 12, 2016, Garrett and Thurston were at Thurston's apartment. Thurston made sexual advances toward Garrett. Garrett told Thurston "'no' and 'this is not going to happen." Thurston touched her repeatedly, with consent at first and then later without consent. The next day they discussed the incident and decided to "never cross the 'friend' line again."

Over the next few weeks, the two exchanged almost 1,500 text messages, spent the night in the same bed at least twice, and made plans to celebrate Thanksgiving together with Thurston's family. But the night before that trip Garrett appeared to become suicidal. Around 8:00 p.m. she texted Thurston: "Ok so since you haven't told me anything about [Thanksgiving] I'm going to assume that's your way of making sure I don't come … I tried … Just do me a favor and if I don't

2

answer I. The mornin f come Check on [my dog] Last time I did this I ended up throwing up in my sleep and I'm not trying to leave her under [*]Unfed." About 30 minutes later, Thurston responded, "What did you do? I'm on my way." When Thurston arrived, Garrett told him to leave. She then texted him: "I'm taking two more Sleeping pills and another Xanax in CD-R [(case)] you need to kno" then got angry at him "For driving away wheno literally cam After You." She continued, "In all honesty, all of this would be a lot easier for me if you just shot me And I'm being 100% serious … Actually please do … Just come back, watch me drink, and make sure I sleep on my back."

Thurston called the police, who reviewed the texts and then, under Florida's Baker Act, involuntarily committed Garrett. After an initial assessment, the hospital recommended that Garrett "be admitted to the unit for stabilization" because she "appear[ed] to be an imminent threat to herself." Three days later, she was discharged. About a week after that Garrett told the director of the psychology doctoral program about the November 12, 2016, incident. The director immediately sent an incident report to USF's senior Title IX coordinator, stating that Garrett was under a "high degree of stress" and "would like the perp removed from the program."

Within a day of hearing of the assault, USF assigned a victim advocate to support Garrett and informed her of its policies and her various options, including filing a formal complaint or a report with law enforcement. That same day, at

3

Garrett's request, her advocate began asking her professors to "excuse absences or any missed coursework" and even helped her seek an extension on a paper due the next day. Three days later, Garrett met with the Associate Director of the Office of Student Rights and Responsibilities (OSRR), Johnathan Monti. She decided to file a formal complaint but did not want to report the incident to law enforcement. During that meeting, Monti explained the interim measures and accommodations that could be put in place, but Garrett "requested that no interim measures be put in place." Monti specifically told her that USF could issue a no contact order. Garrett stated that she did not need one. Monti informed her that she could request interim measures at any time. That same day USF opened a formal inquiry and assigned an investigator to the case.

The investigator met with Garrett, Thurston, and other witnesses, including Garrett's parents. She reviewed nearly 1,500 text messages between Garrett and Thurston after the assault as well as other relevant text messages. She allowed Garrett to provide an initial written statement as well as an additional written statement, responding to the information Thurston had presented. Within about two months, the investigator had completed the investigation and submitted her report to the OSRR director, who ultimately decided the appropriate sanctions and who did not speak to Garrett. The report concluded that there was sufficient evidence to

present formal charges, though there was disputed information as to Thurston's actual guilt.

On March 9, 2017, the OSRR director, following the process set forth in the student code of conduct, sent a "disposition letter" to Thurston. That letter informed Thurston that he was being charged under the student code and that he could either (1) accept responsibility and the proposed sanctions; or (2) deny responsibility, reject the proposed sanctions, and demand a formal hearing. The proposed sanctions included: (1) deferred suspension, which subjected Thurston to immediate suspension for any future violation of the student code and required Thurston to meet with the OSRR director twice for follow-up discussions; and (2) a "no-contact order," which prohibited Thurston "from making contact with … Garrett by telephone, in writing, electronically, by third party, or in person both on and off campus." The letter also warned Thurston that demanding a hearing might "result in determinations and measures more severe" than those outlined. Garrett was informed of the proposed sanctions and Thurston's options the same day.

Also that same day, Thurston—covering for a friend who did not know Garrett would be present because Garrett "had not been there for [the] other proctor sessions,"—walked into a room where Garrett was proctoring a test. When Garrett saw him, she ran out and had a panic attack. She called the investigator and asked

that an interim no contact order be put in place. The university sent a no contact order to Thurston that same day.

Ultimately, Thurston accepted responsibility and the proposed sanctions, and USF notified Garrett of his decision and informed her that she could appeal. Garrett emailed USF that she intended to appeal, which created a novel situation for USF: Never before had the complainant sought an appeal in pursuit of more punitive sanctions after the accused had accepted responsibility and the proposed sanctions— forgoing a hearing. In response, the dean of students created a new appellate procedure. Because Thurston had accepted responsibility in exchange for the specific proposed sanctions, the dean decided that if Garrett sought sanctions harsher than those he accepted, Thurston must be allowed to withdraw his acceptance and demand a hearing. That hearing would follow the "established process for hearings," and Thurston or Garrett could appeal from its outcome. Thurston could also waive the hearing, leave his acceptance in place, and respond to the sanctions-appeal in writing.

The dean met with Garrett to discuss the appeals process. Afterwards, Garrett told her USF advocate that she wanted to avoid a hearing "at all costs" and asked if the psychology department could unilaterally expel Thurston. However, OSRR's director explained that expelling Thurston despite his acceptance of the sanctions

could subject USF to a Title IX claim from Thurston. Garrett also inquired about other potential restrictions that USF could impose on Thurston absent an appeal.

The next day Senior Title IX Coordinator Crystal Coombes met with Garrett to discuss her concerns. Garrett told Coombes that she wanted Thurston banned from the psychology building, the psychology parking lot, and any school-related event that she attended. Garrett told Coombes that "if she saw [Thurston's] car [in the psychology building parking lot] and she walked into the building, she would immediately believe that he was going to attack her." Coombes promised to "work[] diligently" to figure out some options and to set up a follow-up meeting no later than April 15, 2017. However, on April 10, 2017, Garrett emailed the dean of students to formally retract her appeal. The dean would not accept Garrett's retraction until after she had met with Coombes, which was set for the next day.

At that meeting, Coombes explained that, absent an appeal, USF could not ban Thurston from the psychology building because his major professor said that he needed to be there to do his research. USF could, however, limit his access to only his floor, split the brown bag lunch events (optional weekly presentations to the whole psychology department), and provide explicit schedules to make sure they were on campus at separate times. Coombes also explained that USF could provide a faculty supervisor at any event where they were both present. Garrett was "extremely upset" and requested a remote research assistant position for the summer

and potentially a year-long internship so that she could take a leave of absence. Coombes stated that the psychology program "want[ed] to give her the opportunity to do what she need[ed]." Coombes also explained that "her professors were willing to work with her if she took incompletes." The next day the dean accepted Garrett's appeal retraction. And her advocate, at Garrett's request, reached out to any professor Garrett named to negotiate incompletes.

Two weeks later, a psychology organization that was unaffiliated with USF hosted a three-day conference in Orlando, Florida. USF doctoral students were required to present their research at conferences in general, but USF did not require them to attend this conference in particular. Still, both Garrett and Thurston attended. Only Garrett presented. While waiting to register for the conference, Garrett and Thurston stood in adjacent lines. Garrett also saw Thurston at several receptions, in the hallways, at different presentations, and in the communal areas. Thurston never attempted to speak to Garrett or communicate with her in any way, and Garrett never reported this incident to USF. Garrett saw Thurston only one other time after the sanctions were in place—Thurston once attended the same brown-bag lunch as Garrett.

In mid-May, Coombes set up a meeting with Garrett and her USF advocate to discuss again the restrictions USF could impose without an appeal. Garrett met with her advocate before the meeting and told her that "it d[idn't] even matter anymore

8

because she [was] suing the university." Garrett also said that "she had a list of questions from her lawyer that she wanted to ask about." At the meeting, Coombes told Garrett that Thurston had refused to agree to the additional restrictions, such as a schedule that restricted the times he could be on campus and splitting the brown bag lunches. The sanctions that he had agreed to, however, were still in place. In response, Garrett complained that the Title IX process had not been handled properly. Coombes explained that Garrett had three options: (1) she could accept the sanctions as they were; (2) she could file a complaint with USF about the Title IX management of the situation; or (3) she could seek to renew her appeal of the sanctions.

Without Coombes's consent, Garrett recorded that conversation, which she mentioned to her advocate afterwards. Her advocate reported to OSRR that Garrett might have violated the student code by illicitly recording the conversation. The associate director of OSRR investigated the incident, and Garrett admitted to making the recording without permission. OSRR charged Garrett with violating the student code by recording a conversation without the permission of all the participants in violation of Florida law. USF gave Garrett two options: (1) accept responsibility and complete two ethics workshops; or (2) demand a hearing. Garrett demanded a hearing, before the conduct board—made up of two students and two faculty

9

members—which found that she had violated the student code and sent her a Letter of Warning as her only punishment. Garrett accepted the conduct board's decision.

Garrett filed a three-count complaint in the district court, claiming Title IX violations for a hostile educational environment, a clearly unreasonable response to sexual violence, and retaliation. The district court granted USF's motion to dismiss on the second count but allowed the first and the third to proceed. After discovery, the district court granted USF's motion for summary judgment on the remaining counts and closed the case. Garrett timely appealed the order granting summary judgement.

## II.    STANDARD OF REVIEW

This Court reviews a grant of summary judgment *de novo*. *Newcomb v. Spring Creek Cooler, Inc.*, 926 F.3d 709, 713 (11th Cir. 2019). This Court, "[l]ike the district court, [is] required to view the facts in the light most favorable to the non-movant." *Davis v. DeKalb Cty. Sch. Dist.*, 233 F.3d 1367, 1371 (11th Cir. 2000).

## III.    DISCUSSION

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX is enforceable against Title IX funding recipients both administratively, 20 U.S.C. § 1682, and through an implied cause of

action, *Cannon v. Univ. of Chi.*, 441 U.S. 677, 717 (1979). But a Title IX recipient can be liable for damages only for its own misconduct. *Davis* ex rel. *LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640 (1999). A recipient can, thus, be held liable for teacher-on-student or student-on-student harassment only where its own misconduct "caused" the discrimination. *Id.* at 642–43.

Here, Garrett argues that there are jury questions as to whether USF "violated Title IX by subjecting [Garrett] to additional harassment and by retaliating against [Garrett] for engaging in statutorily protected expression." Both arguments fail. The question is not about whether Garrett was sexually assaulted by a fellow graduate student or whether she suffered because of that off-campus sexual assault—we assume for purposes of summary judgment that she was and that she did. The question is whether the university is liable under Title IX for how it responded to that off-campus sexual assault or for charging Garrett for her violation of the student code. It is not. The district court correctly granted summary judgment. We affirm.

### A. *Title IX Liability for Student-on-Student Sexual Harassment*

Under Title IX, the standard for finding a school liable "for student-on-student sexual harassment … is far more rigorous than a claim for teacher-on-student harassment." *Hill v. Cundiff*, 797 F.3d 948, 968 (11th Cir. 2015) (citing *Davis* ex rel. *LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650–53 (1999)). Indeed, a Title IX claim predicated on student-on-student sexual harassment requires six

11

elements. First, the defendant must be a Title IX funding recipient. *Id.* at 970. Second, an "appropriate person"—one with the authority to address the harassment, *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1293 (11th Cir. 2007)—must have "actual knowledge of discrimination in the recipient's programs." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998). Third, the recipient must respond with deliberate indifference to the known acts of harassment in its programs. *Davis*, 526 U.S. at 633. Fourth, the recipient's deliberate indifference must "subject[] the plaintiff to further discrimination." *Williams*, 477 F.3d at 1296. Fifth, the harassment must be "severe, pervasive, and objectively offensive." *Davis*, 526 U.S. at 633. Sixth, the harassment must "effectively bar[] the victim's access to an educational opportunity or benefit." *Id.*

Even construing the evidence in the light most favorable to Garrett, she has failed to establish a genuine issue of material fact on the third element—that USF responded to her claim of sexual harassment with deliberate indifference. A Title IX funding recipient is deliberatively indifferent "only where the recipient's response is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. This standard is "rigorous and hard to meet." *Hill*, 797 F.3d at 975. It is also "contextual: it does not require school districts to simply do *something* in response to sexual harassment; rather, they must respond in a manner that is not 'clearly unreasonable in light of the *known* circumstances.'" *Doe v. Sch. Bd. of Broward*

*Cty.*, 604 F.3d 1248, 1263 (11th Cir. 2010) (quoting *Davis*, 526 U.S. at 648). Further, it does not require a school to "remedy" peer harassment—as Garrett argues—but "merely [to] respond to known peer harassment in a manner that is not clearly unreasonable." *Davis*, 526 U.S. at 648–49. And because the deliberate indifference standard is not "a mere 'reasonableness' standard," courts can "identify a response as not 'clearly unreasonable' as a matter of law." *Id.* at 649.

USF's response was not clearly unreasonable given the known circumstances. In cases where this Court has found potential Title IX liability for student-on-student harassment, the school responded to a report of sexual assault by effectively doing nothing.[1] In fact, in each of those cases, the schools' indifference also caused, at least in part, the actual assault.[2] But here, USF had no control over the off-campus assault or reason to believe that it would happen. *See Davis*, 526 U.S. at 645 ("[T]he harassment must take place in a context subject to the school district's control."). And within a day of hearing of the assault, USF assigned a victim advocate to

---

[1] *See Hill*, 797 F.3d at 973 (failing "to help Doe in any way" after she was sodomized in the bathroom because of the school-orchestrated and then botched rape-bait scheme); *Williams*, 477 F.3d at 1296–97 (taking no corrective action for almost eleven months after the reported gang-rape).

[2] *See Hill*, 797 F.3d at 972 (explaining that the case was "unique" and met the severe, pervasive and objectively offensive element because the school "effectively participated in [the] sexual harassment by setting Doe up in a rape-bait scheme"); *Williams*, 477 F.3d at 1296 (explaining that the university "caused Williams to be the victim" of the gang-rape by recruiting a male with known past sexual misconduct, placing him unsupervised in a student dorm, and not informing him of the university sexual harassment policy).

13

support Garrett and informed her of its policies and her options. Three days later, the associate director of OSRR met with Garrett, who decided to file a formal complaint. That same day USF opened a formal inquiry and assigned an investigator to the case.

Based on the investigation, USF decided that if Thurston accepted responsibility, a deferred suspension and no-contact order were appropriate punishments and remedies. The investigator performed a thorough and timely investigation, in which Garrett participated and submitted evidence and written statements. After the investigation, USF knew: (1) there was sufficient evidence to present formal charges, though disputed information as to Thurston's actual guilt; (2) Thurston had no record of sexual misconduct; (3) Garrett had requested that no interim measures be put in place and had told USF that she did not need a no contact order; (4) Garrett and Thurston had no classes together, had offices on different floors, and pursued different research projects; and (5) even without interim measures, Garrett had not seen Thurston (on campus or off) at all since reporting the incident.

Given what USF knew after the investigation, we cannot say its offer to Thurston of a deferred suspension and a no-contact order was clearly unreasonable. *See Davis*, 526 U.S. at 648 ("[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators." (citation omitted)). At that time, though Garrett did not want to see Thurston, she did not seem to fear him, they

14

naturally did not see each other often, and Thurston was a first-time offender. *See Doe v. Sch. Bd. of Broward Cty.*, 604 F.3d 1248, 1260–61 (11th Cir. 2010) (holding—under the stricter teacher-on-student deliberate indifference standard—that "failure to institute informal corrective measures such as admonishing [the teacher] to avoid his female students between classes or monitoring his classroom for the appearance of any impropriety probably would not … render the School Board's response clearly unreasonable 'in light of the known circumstances'" because the student's "complaint was the first allegation of sexual misconduct against" the teacher). Title IX does not grant a victim of student-on-student harassment the right to choose a school's remedial measures. *Davis*, 526 U.S. at 648.

We also cannot say that USF's additional responses were clearly unreasonable. After the proposed sanctions were relayed to Garrett and Thurston, USF could not impose additional or stricter ones without offering Thurston a hearing so as not to violate his rights. And it is "entirely reasonable for a school to refrain from a form of disciplinary action that would expose it to constitutional or statutory claims." *Davis*, 526 U.S. at 649. Moreover, Title IX does not provide "that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action" such as "immediately suspend[ing] or expel[ling] a student accused of sexual harassment." *Id.* (citation omitted).

15

Because as a matter of law, USF's response was not "clearly unreasonable" as Supreme Court and Eleventh Circuit Title IX jurisprudence employs the standard, Garrett's Title IX sexual harassment claim fails.  We need not, and do not, discuss the other elements of her claim. The district court correctly concluded that Garrett failed to establish a jury issue about whether USF acted with deliberate indifference—a standard that is "rigorous and difficult to meet." *Hill*, 797 F.3d at 975.

## B.  Title IX Liability for Retaliation

For Garrett's second claim, she argues that USF retaliated against her for "criticizing [its] handling of her complaint." She has failed to meet her burden on this claim as well. To establish a prima facie case for retaliation under Title IX, a plaintiff must show that (1) she engaged in statutorily protected expression; (2) Defendants took action that would have been materially adverse to a reasonable complainant; and (3) a causal link existed between the two events.  *See Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53 (2006); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).  If the plaintiff establishes a prima facie case, the burden shifts to the defendant to "articulat[e] a legitimate, non-discriminatory reason for the adverse" action. *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009). If the defendant does so, the plaintiff then must present evidence that "the

defendant's proffered reason was merely a pretext to mask discriminatory actions." *Id.* (citation omitted).

Even assuming—without deciding—that Garrett established a prima facie case for retaliation under Title IX, USF offered a legitimate, non-discriminatory reason for the discipline, and Garrett has not offered any evidence to suggest that the reason was pretextual. USF charged Garrett under the student code because she covertly recorded a conversation that she had with her advocate and the Title IX coordinator. Recording any conversation without the express permission of all participants violates Florida law, which in turn violates the student code. USF, thus, met its burden to articulate a legitimate, non-discriminatory reason for the alleged adverse action.

But Garrett has failed to show pretext. To establish that a proffered reason is merely pretextual, a plaintiff must "present concrete evidence in the form of specific facts" that the proffered reason is not the real reason. *Bryant*, 575 F.3d at 1308; *see also Jones v. Gulfcoast Health Care of Del.*, 854 F.3d 1261, 1274 (11th Cir. 2017). Here, Garrett has presented no evidence that would allow a reasonble jury to conclude that USF's real reason for charging her for violating the student code was as retaliation for her Title IX complaint.

Garrett argues that the university's proffered reason is pretextual because (1) USF "never obtained a legal determination" that her conduct violated Florida law;

17

(2) she had a legitimate reason to record the conversation; and (3) the pre-hearing, proposed sanctions—attending two ethics workshops—were more severe than the sanctions imposed on Thurston. These arguments do not undermine USF's proffered reason for its action. First, USF charged Garrett with committing a "[v]iolation of … [l]aw (as determined by the University)," which the student code explains does not require "[a]djudication by an outside entity … [for] a determination of responsibility by the University." It does not establish pretext for USF to follow the rules laid out in its student code. Second, no matter how legitimate Garrett's reason for recording the conversation, her reason cannot justify recording it *covertly* in arguable violation of Florida law—the action for which she was punished. Third, mandatory attendance at two ethics workshops—a two-event punishment that appears to have been intended only as educational—is not a more severe punishment than a deferred suspension lasting over a year with two follow-up meetings and a no-contact order—a year-plus-long punishment that appears to have been intended to be disciplinary, educational, and remedial. And in the end Garrett did not have to attend the workshops—the only repercussion was a letter of warning from USF. The district court correctly granted USF's motion for summary judgment on Garrett's retaliation claim.

## IV.    CONCLUSION

This Court **AFFIRMS** the district court's grant of summary judgment.